21-2998-cv
*Murphy v. Hughson et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2022

(Argued: March 14, 2023      Decided: September 21, 2023)

Docket No. 21-2998-cv

_____

CHRISTOPHER M. MURPHY,
*Plaintiff-Appellant,*


*v.*


ANDREW C. HUGHSON, FRANK B. HILLMAN, DANIEL HOWE, GLENN GUNDERMAN, WILLIAM WASHBURN, JOSEPH SPENCER, CORRECTIONAL OFFICER DAVID STRONG, *Defendants-Appellees,*

COUNTY OF CHEMUNG, CITY OF ELMIRA, JOHN DOE, BEING INDIVIDUALS NUMBER 1-5, EMPLOYED AS POLICE OFFICERS BY THE CITY OF ELMIRA, AND SHERIFFS BY THE COUNTY SHERIFF'S DEPARTMENT, WHOSE ACTUAL NAMES AND IDENTITIES ARE UNKNOWN AT THIS TIME,
*Defendants*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

Before:      LEVAL, CHIN, and PÉREZ, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the Western District of New York (Frank P. Geraci, Jr., *Judge*) dismissing plaintiff-appellant's amended complaint asserting that his civil rights were violated when (1) he was subjected to a strip search upon his admission to the Chemung County Jail as a misdemeanor arrestee, and (2) his release was delayed following the posting of his bail. The district court granted summary judgment in favor of defendants-appellees, holding that (1) the search was constitutional and the searching officer was entitled to qualified immunity, and (2) the two-hour delay in plaintiff-appellant's release did not rise to the level of a constitutional violation.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

_____

CHRISTOPHER M. MURPHY, pro se, Bath, NY.

KAYLA A. ARIAS (Paul Andrew Sanders, *on the brief*), Barclay Damon LLP, Rochester, NY, *for Defendants-Appellees.*

_____

CHIN, *Circuit Judge*.

On June 5, 2014, plaintiff-appellant Christopher Murphy was sitting on a bus when police officers boarded the bus, removed him, and arrested him on a misdemeanor bench warrant. Murphy, then 67 years old, was a resident of

2

the City of Elmira (the "City"), in Chemung County (the "County"), New York. Murphy was taken to the County Jail, where an officer subjected him to a visual body cavity strip search. In addition, although Murphy's girlfriend promptly posted his bail, his release was delayed about two hours.

Murphy sued the County, the City, and officers in the County Sheriff's Department and City Police Department in the Western District of New York pursuant to 42 U.S.C. § 1983, claiming that the strip search and the delay in his release violated his constitutional rights. The district court (Geraci, *J.*) dismissed the claims against the City and County at the outset of the case and eventually granted summary judgment dismissing the claims against the individual defendants as well, holding that (1) the search was constitutional and the searching officer was entitled to qualified immunity, and (2) the two-hour delay in his release did not rise to the level of a constitutional violation. Murphy appeals the dismissal of the claims against the individual defendants.

We AFFIRM in part, VACATE in part, and REMAND for further proceedings.

## *BACKGROUND*

Because this appeal arises from a grant of summary judgment, we recite the facts in the light most favorable to Murphy, the non-moving party, and

3

draw all reasonable inferences in his favor. *See Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022).

## I. *The Facts*

On the morning of June 5, 2014, Murphy was sitting on a bus at the County Transportation Center in Elmira, New York. The bus was scheduled to depart at 9 a.m., and Murphy was planning on taking it some twenty miles to Sayre, Pennsylvania, where he had four medical appointments scheduled. Before the bus could leave, however, police officers arrived and asked Murphy to disembark.[1] Once the officers confirmed his identity, they handcuffed him, placed him in a police car, and took him to the Elmira City Hall.[2] The officers arrested Murphy pursuant to an "active bench warrant" issued by the Elmira City Court charging him with the offense of maintaining a "structure unfit for human occupancy" in violation of § 107.1.3 of the New York State Property Maintenance Code, as well as "lesser offense(s)" of violating the Property Maintenance Code

---

[1]     The City Police Department had received an "anonymous tip" that Murphy was at the County Transportation Center. Doc. 67-5 at 1. References to "Doc." in this opinion are to materials filed on the district court's docket in *Murphy v. County of Chemung et al.*, W.D.N.Y. No. 17-cv-6339.

[2]     At his deposition, Murphy testified that the officers took him to "the police station." Doc. 67-10 at 10. The Police Department and the Elmira City Court were both located at City Hall.

4

and the New York State Fire Code. Docs. 67-5 at 1; 67-1 at 1. These "[c]ode violations" relating to Murphy's home had been charged in a "misdemeanor complaint." Doc. 67-10 at 13.

At City Hall, the officers put a chain around Murphy's waist before taking him to court. They placed him in a room outside the courtroom and, at approximately 9:45 to 10 a.m., they brought him before Judge Steven W. Forrest of the Elmira City Court. Murphy's girlfriend, Barbara Camilli, was sitting in the courtroom. Judge Forrest set bail at $750 cash or a $1,500 surety bond, and ordered that Murphy remain in custody until he made bail or until 1 p.m., when he was to return to court. Murphy advised the court that he only had $400 in his possession and asked the court to lower the bail to that amount. The court denied the request and told Murphy that, unless he made bail, he would remain in custody until 1 p.m. Hence, as confirmed by the Securing Order signed by the court, Murphy was remanded to the custody of the County only until he returned to court at 1 p.m. or until he posted bail, whichever came first. *See* Doc. 67-1. While he was still in the courtroom, Murphy asked Camilli to go to an ATM to get the balance of the money he needed to make bail.

Murphy was taken from the courtroom downstairs, back to "the Elmira police station proper," and placed into a "small room." Doc. 67-11 at 16.

He was not fingerprinted, photographed, or processed at that point. After waiting there for about five minutes, he heard Camilli, outside the room, saying, "I'm here with his bail." *Id.* at 23-24. Although he could not see what was happening, Murphy heard a male police officer tell Camilli that because Murphy was in the Sheriff's custody, he could not be released from the Police Department, but had to be taken to the County Jail, and that she had to go there to bail him out.

After about another twenty minutes, Murphy was transported by van from City Hall to the County Jail, a short ride away. He was put into a holding cell, and after five or ten minutes an officer, Gunderman, fingerprinted and photographed him. The fingerprinting took a while because Gunderman was having trouble with the process. As Murphy was being fingerprinted, Gunderman said to him "[y]our bail's sitting out there and we're going to cut you loose" or "[w]e've got to cut you loose." *Id.* at 50. Gunderman also said that Camilli -- who was attempting to post Murphy's bail and secure his release -- was "making a real fuss, making a real commotion" about the delay. *Id.* at 51. Murphy's impression was that he would be released "immediately." *Id.*

Murphy was then placed into a second holding cell, where a young man was already being detained. After about an hour, and about an hour before

6

Murphy was due back in court, the Booking and Admissions Officer --

defendant-appellee William Washburn -- removed him from the cell. Washburn

brought Murphy to a small room and conducted a visual body cavity search,

requiring Murphy to disrobe, lift his scrotum, and spread his buttocks.[3]

Washburn did not touch Murphy during the search, which lasted around

ten minutes.[4]

After the search was completed, Washburn escorted Murphy out of

the search room. Washburn gestured to other officers with his thumb and

forefinger, which Murphy understood as mockingly connoting that he had a

small penis. Murphy was then brought back to the holding cell. After ten or

fifteen minutes, officers took him to a different area for questioning, where he

was processed; deputies asked him personal questions for another ten or fifteen

---

[3]     A "visual body cavity search" is the inspection of a person's body cavities
without contact, such as by having the person manipulate his anatomy, bend over, or
squat and cough. It is more intrusive than a "strip search," which requires a person to
remove his clothes for a more cursory inspection, but less intrusive than a "manual body
cavity search," which entails physical inspection of body cavities. *Gonzalez v. City of
Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013). Because the distinction between these
categories is not here material to our decision, we sometimes refer to the search as
simply a "strip search," following the language used in the discovery materials and by
the district court.
[4]     As we discuss below, Washburn denies any involvement in the strip search. In
reviewing the district court's grant of summary judgment, however, we view the
disputed facts in the light most favorable to Murphy, who testified at his deposition
that Washburn conducted the search.

minutes, with one or two of the deputies typing into a computer. During the questioning, Murphy repeatedly asked when he would be released, noting that his bail had been posted. Murphy received no response, except from one deputy who said "Well, we've got to take you to court at 1:00." Doc. 67-11 at 68.

At least two or three times, in the presence of other deputies, Gunderman said "[t]his guy's bail's out there. We've got to cut him loose." *Id.* at 62. Washburn responded: "No. We're not done with him yet. He's not going anywhere. He's going to sit in my jail for a while." *Id.* at 61. Washburn made comments to this effect both before and after the strip search.

After the questioning was completed, Murphy was returned to the holding cell. Shortly thereafter, he was released, without ever entering the jail's general population. At that point, it was close to 1:00, and so Murphy, accompanied by Camilli, walked directly over to court to appear before Judge Forrest.

At the time, strip searches in the County were governed by rules set forth in a policy numbered C-110 (the "Policy"), which bore the subject line "Admitting of Inmates into the Facility" and was produced in discovery. The Policy provides, *inter alia*, that "only those inmates that present a *reasonable suspicion* for being strip-searched will be strip-searched. All other new

8

admissions that do not meet these criteria will be pat searched only." Doc. 66-9 at 2. The Policy also requires that, if a strip search is conducted, "a report will be made" setting forth (1) the reason(s) for the search; (2) the search's time, date, and location; (3) the supervisor or officer-in-charge who authorized the search; and (4) the officer who conducted the search. *Id.* at 2-3.

The strip search of Murphy was reported on a form, also produced during discovery, entitled "Strip Search Justification Sheet" (the "Justification Sheet"). It notes the date and time of the search (June 5, 2014, at noon) and lists Washburn as the "Search Officer." Doc. 66-8 at 2. In the space reserved for the "[e]xplanation of the grounds or reasons for conducting a strip search," the form states only "per Post 1." *Id.* The form does not name any supervisor or officer who authorized the search; rather, the fields for "finding/result of search," the "Watch Commander's Signature," badge number, date and time, and an additional space for "[c]omments" are all blank. *Id.*

## II.    *The Proceedings Below*

Murphy initiated this lawsuit on June 1, 2017. *See* Doc. 1. In his amended complaint, Murphy alleges that the individual defendants -- Washburn, other County employees, and several Elmira police officers -- violated his federal constitutional rights by subjecting him to an unjustified strip search and delaying

9

his release after Camilli posted his bail. *See generally* Doc. 7. A longtime resident of Elmira, Murphy contends he was targeted for harassment because of his contentious relationship with the City and County, which included prior legal disputes.

In his deposition, Murphy identified Washburn as the officer who conducted the strip search. Although Washburn was not deposed, during discovery, he submitted an affidavit stating that he had neither conducted the strip search nor directed that it be conducted. Rather, he identified himself as the "Booking/Admissions Officer," meaning he had "merely recorded that the strip search took place as part of the booking process." Doc. 66-7 ¶ 15. According to Washburn, the notation "per Post 1" on the Justification Sheet meant that some supervisory officer -- he did not identify whom -- had authorized the search. *Id.* ¶ 16. Washburn contended that the strip search "was necessarily based on reasonable suspicion" because the Policy required it to be; moreover, Washburn averred, neither he nor any other officer "directed to perform the search[] would have had the discretion to disobey the order." *Id.* ¶¶ 17-18. On this basis, Washburn argued, even assuming "for purposes of this motion only" that he had conducted the search, he "would have lacked discretion as to whether or not to

10

perform" it because it "would have occurred solely based upon a direct order from a superior pursuant to Chemung County Jail policy." *Id.* ¶ 19.

Washburn's affidavit also addressed the alleged delay in releasing Murphy. According to Washburn, detainees cannot be released until the booking process is completed because the County's computer system will not accept bail payments until all charges have been entered near the end of the booking process.

The district court granted summary judgment to defendants. *Murphy v. Hughson*, No. 17-cv-6339 (FPG), 2021 WL 5199938, at *1 (W.D.N.Y. Nov. 9, 2021). After ruling that several of the named County defendants were not personally involved and thus could not be liable under § 1983, *see id.* at *2-3, the court addressed Murphy's delay and strip-search claims, *see id.* at *3-5.

As to the delay in his release, the court determined that the City defendants did not violate Murphy's constitutional rights and were, in any case, entitled to qualified immunity because under New York Criminal Procedure Law § 520.15, the court and County, not the City, are responsible for accepting bail. *Id.* at *5. The court held that the County defendants were also entitled to summary judgment: They had not violated Murphy's constitutional rights

11

because the delay of approximately two hours while Murphy was being processed did not shock the conscience. *Id.* at *2-4.

Finally, the district court held that the strip search did not violate Murphy's Fourth Amendment right to be free from unreasonable searches and seizures. Although the Justification Sheet did not indicate what circumstances justified strip searching Murphy, the district court reasoned that, under *Florence v. Board of Chosen Freeholders of Burlington County*, 566 U.S. 318 (2012), no reasonable suspicion was required. *Id.* at *4. Rather, the court concluded, *Florence* compelled deference to Washburn's conduct absent "substantial evidence" of an "exaggerated" response, which Murphy had not offered. *Id.* (quoting *Florence*, 566 U.S. at 328). Moreover, the district court determined that Washburn would, regardless, be entitled to qualified immunity because "there is no question that an officer of reasonable competence would have thought that conducting a strip search of a new inmate at the direction of a superior was constitutional." *Id.* at *5 (citing *Vasquez v. Maloney*, 990 F.3d 232, 241 (2d Cir. 2021)). In doing so, the district court apparently concluded that if Washburn conducted the search, he would have done so at the direction of a superior officer. *Id.*

Judgment was entered accordingly, and this appeal followed.[5]

## *DISCUSSION*

We review a grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party to determine whether genuine issues of material fact preclude judgment as a matter of law. *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992); *see* Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists if the record, and appropriate inferences drawn from it, would permit a reasonable jury to return a verdict for the nonmoving party.  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006).

The district court premised its decision in part on qualified immunity.  Where properly asserted, qualified immunity bars claims for

---

[5] Murphy has not appealed the district court's grant of summary judgment in favor of defendants-appellees Hughson and Hillman.  He does challenge the district court's denial of his motion for further discovery (filed after defendants had moved for summary judgment), but we perceive no abuse of discretion in the challenged ruling. *See L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 117 (2d Cir. 2020) ("We review the district court's decision to forgo further discovery for abuse of discretion.").  We also agree with the district court that summary judgment was properly granted to defendants-appellees Howe, Gunderman, Spencer, and Strong because, on this record, there is no genuine dispute of material fact as to their lack of personal involvement in the relevant misconduct. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (requiring personal involvement in the alleged constitutional deprivation for an award of damages under § 1983).  We therefore affirm these aspects of the district court's judgment.

violations of constitutional rights unless "(1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged conduct." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023). "A right is clearly established" if "every reasonable official would have understood that what he is doing violates that right" and existing precedent places the question "beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (internal quotation marks omitted) (first quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam); and then quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). Each defendant bears the burden of establishing that he is entitled to qualified immunity. *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

We first address Murphy's claim about the strip search and then turn to his claim about the delay in his release.

## I.    *The Strip-Search Claim*

### A.    *Applicable Law*

Prior to the Supreme Court's decision in *Florence*, we had long held that misdemeanor detainees could not be subjected to strip searches without reasonable suspicion. In *Weber v. Dell*, 804 F.2d 796 (2d Cir. 1986), for instance, we determined that "the Fourth Amendment precludes [jail] officials from performing strip/body cavity searches of arrestees charged with misdemeanors

14

or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Id.* at 802; *see also Shain v. Ellison*, 273 F.3d 56, 59, 62-66 (2d Cir. 2001) (finding it "clearly established" that "corrections officers in a local correctional facility could not perform a strip search . . . on an individual arraigned on misdemeanor charges unless the officers had reasonable suspicion that the individual possessed contraband or weapons"); *Wachtler v. County of Herkimer*, 35 F.3d 77, 81 (2d Cir. 1994) ("We have held that the Fourth Amendment proscription of strip-searches of misdemeanor arrestees without reasonable suspicion is clearly enough established to preclude the defense of qualified immunity."). These decisions were largely aligned with our holdings about strip searches that did not involve jails or prisons -- in other words, situations in which the security concerns of a jail or prison facility were not at issue. *See, e.g.*, *Hartline v. Gallo*, 546 F.3d 95, 98-103 (2d Cir. 2008) (finding unconstitutional a strip search of a misdemeanor arrestee at a police station, conducted pursuant to a department policy but without reasonable suspicion, and denying qualified immunity under this Court's clearly established law).

In *Florence*, the Supreme Court considered a policy at the "largest county jail in New Jersey" that required *all* arriving detainees to undergo a visual body cavity search before entering the jail's general population, "regardless of the circumstances of the arrest, the suspected offense, or the detainee's behavior, demeanor, or criminal history."  566 U.S. at 324-25.  In upholding the policy, the Supreme Court reemphasized "the importance of deference to correctional officials" and the related rule that "a regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'"  *Id.* at 326 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).  Synthesizing its prior decisions, the Court explained that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities," *id.* at 328 (citing *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)), and rejected a rule that would require different, less-invasive policies for misdemeanor detainees, on the ground that they may be just as likely to smuggle illicit or dangerous contraband into jails, *id.* at 334-36.  Thus, the Court held, absent "substantial evidence" of an "exaggerated" response to penological concerns, the "security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed

weapon or other contraband." *Id.* at 330 (citing *Block v. Rutherford*, 468 U.S. 576, 584-85 (1984)).

As we have recognized, *see Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013), *Florence* partly abrogated our prior case law, which had premised the legitimacy of intake policies, and thus penological decision-making, on the distinction between misdemeanor and felony detainees. Unless there is "substantial evidence" of an "exaggerated" response, we must now defer to corrections policies that apply to misdemeanor and felony detainees alike. *Florence*, 566 U.S. at 330. Specifically, under *Florence*, "a blanket policy of conducting visual body cavity searches on new inmates [is] constitutional, even for misdemeanor arrestees where there is no reason to suspect the arrestee would have contraband." *Gonzalez*, 728 F.3d at 160.

### B. *Application*

The district court concluded that, even assuming Washburn conducted the strip search, he was entitled to summary judgment. First, the district court reasoned that the search did not violate the Constitution because "*Florence* requires courts to defer to corrections officials absent 'substantial evidence in the record' to show that the officials have 'exaggerated their response,'" and Murphy had presented "no such evidence here." *Murphy*, 2021

17

WL 5199938, at *4 (quoting *Florence*, 566 U.S. at 328). Second, the district court held that even if Washburn had conducted an unconstitutional search, he was protected by qualified immunity because he was acting "at the direction of a superior." *Id.* at *5. We conclude the district court erred in both respects.

### 1. Florence

*Florence* does not dictate the result of this case because Murphy is not challenging a prison-wide policy on its face or as applied to him; rather, his claim concerns actions taken by an individual officer acting on his own whim and contrary to established jail policy. As the Third Circuit has observed, *Florence*'s "'legitimate penological interest' test . . . is ill-suited for assessing unauthorized and malicious conduct on the part of prison guards" in "violation of the applicable regulations." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 231 (3d Cir. 2015).

Defendants do not -- and, in view of the Policy's clear language, cannot -- claim there was a policy requiring that every detainee admitted to the County Jail be strip searched or a policy calling for a strip search of a prisoner with Murphy's characteristics. Nor have they asserted a legitimate penological justification for subjecting Murphy to such a search. Instead, on the facts most favorable to Murphy, which we must accept for these purposes, Murphy was

18

strip searched because of an individual officer's *ad hoc* decision. We conclude

that, in these circumstances, the standard set forth in our pre-*Florence* case law

continues to apply: If a misdemeanor arrestee entering a prison is subjected to

an *ad hoc* strip search, without reasonable suspicion, the Fourth Amendment is

violated. *See, e.g., In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (observing that this

Court is bound to follow prior precedent unless an intervening Supreme Court

decision "casts doubt" on it (internal quotation marks and citation omitted)).[6]

*Florence* did not hold that individual actions, ungrounded in legitimate

penological purposes and in contravention of a jail's policy, are exempt from the

Constitution's requirement that "a search be justified as reasonable under the

circumstances." *Weber*, 804 F.2d at 800; *see also Sloley v. VanBramer*, 945 F.3d 30, 39

(2d Cir. 2019) (requiring police-station visual body cavity searches of arrestees to

be supported by reasonable suspicion, regardless of whether the arrest is for a

---

[6]     Nor does *Florence* foreclose any claim Murphy may have under the New York
Constitution. Although his amended complaint invokes only the United States
Constitution, *pro se* pleadings must be liberally construed to raise the strongest claims
they suggest, including parallel state law claims when state law provides a stronger
legal foundation for the allegations pleaded. *See McLeod v. Jewish Guild for the Blind*, 864
F.3d 154, 157-58 (2d Cir. 2017) (per curiam). In a prior summary order, we observed
that *Florence* did not govern a claim brought under Article 1, Section 12 of the New York
Constitution, which contains New York's counterpart to the Fourth Amendment. *See In
re Nassau Cnty. Strip Search Cases*, 639 F. App'x 746, 749 (2d Cir. 2016) (summary order).
On remand, the district court should consider Murphy's search claim as arising under
both the federal and state constitutions.

19

felony or misdemeanor).[7]  Absent an actual penological justification or

institutional policy, our prior case law on the constitutional boundaries of

permissible strip searches continues to apply.

Here, the jail did not have a policy calling for strip searching

Murphy in the circumstances, nor did it have a legitimate penological interest for

doing so.  Moreover, the Policy was consistent with our pre-*Florence* law,

permitting strip searches only upon individualized reasonable suspicion.  On the

record below, a reasonable jury could surely conclude there was no

constitutionally cognizable reason justifying the strip search.  As the district

court recognized, the Justification Sheet did not provide "any specific reasonable

suspicion to justify the strip search."  *Murphy*, 2021 WL 5199938, at *4.  Indeed,

Murphy was a 67-year-old man, who was sitting on a bus a little before 9 a.m.

He was arrested on a misdemeanor warrant -- not for weapons or drug

violations, but for home maintenance and fire code infractions. Moreover, his

---

[7]      As we observed in *Sloley*, "[v]isual body cavity searches are invasive and
degrading, occasioning a serious invasion of privacy and working a significant harm to
a person's bodily integrity. . . .  They 'require an arrestee not only to strip naked in front
of a stranger, but also to expose the most private areas of her body to others.  This is
often . . . done while the person arrested is required to assume degrading and
humiliating positions.'"  945 F.3d at 38 (quoting *Swain v. Spinney*, 117 F.3d 1, 6 (1st
Cir. 1997)).

$750 bail had been or was being posted; he was to be released or reappear in court no later than 1 p.m., only about an hour after the search took place; and he was not likely to be housed in the jail's general population. In these circumstances, there was little -- if any -- reason to suspect he was hiding a weapon or drugs inside his body cavity or that he would bring contraband into the jail's general population.

At no point in this litigation have defendants purported to identify a legitimate penological purpose for the strip search. Furthermore, there was evidence that Washburn's actions were motivated by malice. He mocked Murphy about the size of his penis. And when another officer noted that Murphy's bail was "out there" and they needed "to cut him loose," Washburn responded in a manner that could be understood to exhibit malice by saying that Murphy would not be going anywhere and was going to sit in "my" jail "for a while." Doc. 66-4 at 60-61. On these facts, a reasonable jury could readily conclude that Washburn was acting not to further legitimate penological concerns but purely out of vindictiveness.

### 2. *Qualified Immunity*

The district court held that Washburn was protected by qualified immunity because there was "no question that an officer of reasonable

competence would have thought that conducting a strip search of a new inmate at the direction of a superior was constitutional." *Murphy*, 2021 WL 5199938, at \*5 (citing *Vasquez*, 990 F.3d at 241). We conclude that genuine issues of fact were presented as to whether Washburn was protected by qualified immunity.

We have held that "[p]lausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists." *Vasquez*, 990 F.3d at 241 (citation omitted). But that test still requires a record of "plausible" instructions that are objectively reasonable, and this record falls short.

First, the record is muddled as to whether Washburn was in fact following the directions of a superior officer. Washburn denies conducting the strip search and argues only hypothetically that *if* he did, he would have been following orders. Doc. 66-7 ¶ 19 ("Assuming, for purposes of this motion only, that it was me that conducted the strip search, I would have lacked discretion as to whether or not to perform the strip search, and the strip search would have occurred solely based upon a direct order from a superior pursuant to Chemung County Jail policy."). Washburn does not state that any order was actually given, and no evidence has been provided as to the identity of any officer who might

have given an order for the search. Moreover, Washburn's self-serving testimony that the entry "per Post 1" on the Justification Sheet meant that a superior officer had ordered the search was not necessarily believable.

Second, on this record, a reasonable jury could find that Washburn was responsible, in whole or in part, for the decision to strip search Murphy. The Justification Sheet, which was supposed to set forth the reason for the search and identify the officer who authorized it, does not provide any reason for the search, does not reveal who (if anyone) authorized the search, and provides no detail about how the search was authorized other than the cryptic designation "per Post 1." Doc. 66-8 at 2. Contrary to Washburn's assertion that he did not conduct the search, the Justification Sheet identifies him as the "Search Officer." *Id.* And Washburn's conclusory assertion that, *if* he conducted the search, he was merely following orders, does not establish or demonstrate as a matter of law that any orders were actually given, suggest that if given they were reasonable or plausible, or show that Washburn was powerless to question them. The absence of reasonable suspicion for the search, Washburn's failure to properly document the search or indicate which superior officer approved it, the crude gesture he made after the search, and his comments about Murphy sitting in "my" jail "for a while" despite bail having been posted are all circumstances from which a

23

reasonable jury could infer that Washburn was acting of his own volition and not pursuant to the orders of a superior.

*Vasquez* is not to the contrary. In that case, we rejected the officers' qualified immunity argument at summary judgment because they asserted they received only "guesswork" from a fellow officer about the basis for detaining the plaintiff, yet the record did not show they had done anything to "corroborate that guess." 990 F.3d at 242. Here, the conclusory and hypothetical statements in Washburn's affidavit do not establish that even "guesswork" was involved.

To sum up, on this record, a reasonable jury could find that, instead of simply following the orders of a superior officer, Washburn was a party to harassment and demeaning conduct culminating in the search -- conduct that he, and other reasonable officers, should have known had no legitimate penological purpose and was therefore unconstitutional. A jury may find otherwise, but in light of these disputed material facts, the district court erred when it granted summary judgment on Murphy's strip search claim.

## II.  *The Delay Claim*

Because Murphy was a pretrial detainee who had already been arraigned, the district court properly assessed his delay claim under the Fourteenth Amendment's substantive due process guarantee. *See Edrei v.*

24

*Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) (confirming pre-trial detainees "rely on the constitutional guarantee of 'due process'" under the Fourteenth Amendment, while arrestees rely on the Fourth Amendment).  Although we have not previously addressed the precise issue Murphy's delay claim presents, other Circuits have recognized that substantive due process concerns are implicated when a detainee's release is delayed after the legal basis for detention has ended. *See, e.g.*, *Goldberg v. Hennepin County*, 417 F.3d 808, 811 (8th Cir. 2005) ("Claims alleging the excessive detention of one who has established the right to be released are typically analyzed under the Due Process Clause."); *Berry v. Baca*, 379 F.3d 764, 773 (9th Cir. 2004) ("[P]laintiffs possessed a constitutional right to freedom from imprisonment a reasonable time after they were judicially determined to be innocent of the charges against them.").

The district court evaluated Murphy's delay claim under the framework articulated in *Lynch v. City of New York*, 335 F. Supp. 3d 645 (S.D.N.Y. 2018), which also involved post-bail detainment.  *See Murphy*, 2021 WL 5199938, at *3.  In *Lynch*, plaintiffs argued that New York City's "procedures for bail payment and release result[ed] in unreasonably lengthy delays in permitting bail to be posted and subsequently releasing detainees for whom bail ha[d] been paid."  335 F. Supp. 3d at 648.  The plaintiffs alleged, *inter alia*, that the city's delay

25

in releasing them after they had already paid their bail was unjustified and resulted in their over-detention in violation of their right to substantive due process. *See id.* at 648-49. The court first reiterated that, to state a substantive due process claim, plaintiffs had to allege (1) a valid liberty interest (2) that the defendants infringed in an arbitrary or irrational manner. *Id.* at 654 (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001)). It then noted that plaintiffs had the burden to sufficiently allege that the city's action was "arbitrary in the constitutional sense," *i.e.*, that it "shocks the conscience." *Id.* (quoting *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005)). The court denied the defendants' motion to dismiss, concluding that the three plaintiffs -- who had been subjected to delays of 9 hours, 18 hours, and 23 hours in their release after the posting of their bail -- had stated a substantive due process claim. *See id.* at 648-49.

The district court was correct to apply *Lynch*'s framework to Murphy's delay claim. *Lynch* properly recognized that claims for unlawful pretrial detention arise under the Fourteenth Amendment, *see id.* at 653, and accurately stated the elements of a substantive due process claim, *see id.* at 654. Moreover, the court in *Lynch* correctly summed up our holdings as to when executive government action shocks the conscience: It "depends on the state of

26

mind of the government actor and the context in which the action was taken." *See id.* (quoting *O'Connor*, 426 F.3d at 203); *see also Edrei*, 892 F.3d at 536 ("[T]he central inquiry has always been whether the government action was rationally related to a legitimate government objective.").

To be certain, "[t]he shocks-the-conscience test is necessarily imprecise." *O'Connor*, 426 F.3d at 203. We have not previously decided what degree of delay in a detainee's release on bail is so egregious as to shock the conscience, but we are mindful that both the Supreme Court and other Circuits have repeatedly held that "[i]n the Fourteenth Amendment context . . . 'there is, of course, a *de minimis* level of imposition with which the Constitution is not concerned.'" *Crocker v. Beatty*, 995 F.3d 1232, 1251 (11th Cir. 2021) (quoting *Bell*, 441 U.S. at 539 n.21)). Although the Supreme Court has rejected such a *de minimis* rule as to whether brief searches or seizures that are conducted without reasonable suspicion after an officer has completed a lawful traffic stop violate the Fourth Amendment, *see Rodriguez v. United States*, 575 U.S. 348, 354 (2015), the Court expressly cabined that decision to the distinctive setting of traffic stops, *see id.* at 356-57. Courts continue to dismiss other constitutional claims brought by detainees when the alleged violations are *de minimis*. *See Crocker*, 995 F.3d at 1248-52; *cf. Hill v. Wetzel*, No. 21-3009, 2022 WL 5422329 (3d Cir. Oct. 7, 2022)

27

(vacating the dismissal of a case because plaintiff had pled more than *de minimis* physical injury).

To defeat summary judgment, Murphy was required to present evidence that a reasonable jury could find that Washburn's actions shocked the conscience. *See O'Connor*, 426 F.3d at 203. Although it is a close call, we conclude that a reasonable jury could so find.

First, construing the facts and reasonable inferences in Murphy's favor, a reasonable jury could find that his release was unnecessarily delayed for as much as two hours. Bail was set around 10 a.m., Camilli presented the bail money at the County Jail by approximately 10:30 a.m., and yet Murphy was not released until shortly before 1 p.m. While some of this time was legitimately related to the time needed to fingerprint, photograph, and process Murphy, a reasonable jury could find that most of it was unnecessary. Of course, factual issues exist as to precisely how much of the delay was required by the booking process and how much was unnecessary.

Second, the delay was not just a matter of the loss of two hours. To the contrary, Murphy was subjected to two hours of distress and uncertainty, and a jury could find that his release was delayed because Washburn decided to subject him to a degrading strip search. *See Sloley*, 945 F.3d at 38 ("Visual body

cavity searches are invasive and degrading, occasioning a serious invasion of privacy and working a significant harm to a person's bodily integrity.").

Third, even if a two-hour delay caused by the inefficiencies of a bureaucratic process without aggravating evidence could not sustain a judgment in favor of a plaintiff, a reasonable jury could find for a plaintiff when the evidence showed that the two-hour delay was occasioned solely by an official's malicious vindictiveness. *See O'Connor*, 426 F.3d at 203 (vacating summary judgment because record supported reasonable inferences that defendant's actions were calculated to injure or spite plaintiff which, if true, would render the behavior conscience-shocking). Again, construing the record in Murphy's favor, Gunderman cautioned Washburn two or three times that Murphy's bail was "out there" and that he had to be released. Yet, Washburn ignored Gunderman and deliberately kept Murphy in "my" jail "for a while." Moreover, Washburn subjected Murphy to a strip search gratuitously, without reasonable suspicion, in contravention of the Policy. Washburn's words and his crude gesture suggest that his actions were not merely negligent but, instead, that he was actively hostile. *See id.* (noting that while "mere negligence will never give rise to a substantive due process violation," due process liability can attach where an officer "acted with a purpose to cause harm").

Of course, there will be instances where a two-hour delay in release following the posting of bail is a *de minimis* intrusion that does not rise to the level of a constitutional violation. But here, a jury could find that the strip search was not rationally related to any legitimate governmental purpose and that Washburn acted deliberately and vindictively. *Cf. County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (observing, in Fourth Amendment context, that delays of less than 48 hours may nevertheless be unconstitutional if motivated by "delay for delay's sake" or "ill will"); *Lynch*, 335 F. Supp. 3d at 648-49, 655 (denying motion to dismiss Fourteenth Amendment claim for delays of 9, 18, and 23 hours after posting of bail, where plaintiffs plausibly alleged that defendants acted with deliberate indifference by delaying release until "a critical mass of bailed-out detainees [had been] gathered"). We conclude in these circumstances that a reasonable jury could find that the delay in Murphy's release shocked the conscience.

## *CONCLUSION*

For the reasons stated above, we AFFIRM the district court's grant of summary judgment to the individual defendants other than Washburn, we VACATE the grant of summary judgment as to Washburn on both Murphy's

search and delay claims, and we REMAND for further proceedings consistent

with this opinion.