21-3075(L)
*Alexander v. City of Syracuse*

In the
United States Court of Appeals
For the Second Circuit

August Term, 2023

(Argued:  October 2, 2023     Decided:  March 14, 2025)

Docket Nos. 21-3075(L), 22-103(C)*

TROY ALEXANDER,

*Plaintiff-Appellant*,

—v.—

CITY OF SYRACUSE, DETECTIVE RORY GILHOOLEY,

*Defendants-Cross-Claimants-Cross-Defendants-Appellees*,

COUNTY OF ONONDAGA,

*Defendant-Cross-Defendant-Cross-Claimant-Appellee*,

L.M.,

*Defendant-Cross-Defendant.* †

Before:      NEWMAN, LEE, and ROBINSON, *Circuit Judges*.

---

* 21-3075 (L) was determined by order filed March 15, 2022.

† The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

Plaintiff-Appellant Troy Alexander appeals from a judgment of the United States District Court for the Northern District of New York (Hurd, *J.*) granting summary judgment to Defendants-Appellees City of Syracuse, County of Onondaga, and Detective Rory Gilhooley.

The summary judgment record, viewed in the light most favorable to Alexander, reflects that on October 24, 2016, after receiving a report of a brutal sexual assault at Alexander's home, the Syracuse Police Department (SPD) dispatched officers to his house. There, officers pushed their way into Alexander's home and searched and seized the residence for approximately 12.5 hours before seeking a search warrant. They also looked into the windows of, and then towed, two of Alexander's cars. After obtaining and executing a warrant, officers discovered narcotics and drug paraphernalia in Alexander's bedroom. The City and County then brought several waves of criminal charges against Alexander, which, respectively, charged offenses relating to burglary, narcotics, and a sexual assault. Alexander posted bail after the first two sets of charges, but was not immediately released. The same happened after he posted bail in connection with the sexual assault. Ultimately, the City and County dropped all charges.

Alexander subsequently filed this action, alleging the City, County, and Detective Gilhooley violated his rights under the U.S. Constitution and New York state law. In particular, he alleges that the warrantless entry, search, and prolonged seizure of his home violated his Fourth Amendment rights, that Detective Gilhooley violated his Fourth Amendment rights by shining a light through the windows of his parked cars, that he was falsely arrested, that he was subjected to malicious prosecution, and that he was improperly detained after posting bail. After discovery closed, the district court awarded summary judgment to the defendants on all claims. Alexander now appeals, principally arguing that the district court impermissibly credited the defendants' version of events over his.

We agree with Alexander, but only in part. Alexander's claims arising from the warrantless entry into and the search and seizure of his home (including his false arrest and malicious prosecution claims) present triable issues of fact. And gaps in the evidentiary record preclude summary judgment for the City and County on Alexander's state law claims arising from his continued detention after posting bail. We therefore **VACATE** and **REMAND** the judgment as to these claims. We **AFFIRM** the judgment in all other respects.

Judge Newman dissents from those parts of the Court's opinion that remand for further proceedings.

———————

TROY ALEXANDER, *pro se*, Syracuse, NY, *for Plaintiff-Appellant*.

DANIELLE R. SMITH (Danielle Pires, Sarah Mae Knickerbocker, *on the brief*), City of Syracuse, Department of Law, Syracuse, NY, *for Defendants-Cross-Claimants-Cross-Defendants-Appellees City of Syracuse and Detective Rory Gilhooley*.

———————

ROBINSON, *Circuit Judge*:

On the evening of October 24, 2016, members of the Syracuse Police Department (SPD) arrived at the home of Troy Alexander following a report that a brutal sexual assault had taken place there the previous night. SPD officers pushed their way into Alexander's residence, seized it for 12.5 hours before seeking a search warrant, and had Alexander's cars towed. The next day, after obtaining and executing a warrant, SPD found narcotics and drug paraphernalia in Alexander's bedroom. The City of Syracuse and County of Onondaga then brought several waves of criminal charges against Alexander, which prompted multiple arraignments and two bail postings. In the midst of these proceedings, Alexander contends defendants improperly delayed Alexander's pretrial release on two occasions—for less than a day after Alexander's first posted bail and for

3

four days after he posted bail a second time. At the end of this series of events, the City and County dropped all of their respective charges against Alexander.

Asserting violations of his rights under the U.S. Constitution and New York law, Alexander sued the City, County, and SPD Detective Rory Gilhooley in the Northern District of New York. The City and Detective Gilhooley jointly filed a motion to dismiss, which the district court (Hurd, *J.*) granted in part. *Alexander v. City of Syracuse*, No. 5:17-cv-1195, 2018 WL 6591426 (N.D.N.Y. Dec. 13, 2018) (*Alexander I*). After discovery, the City and Detective Gilhooley jointly moved for summary judgment on the outstanding claims against them. The district court granted their motion in full. *Alexander v. City of Syracuse*, 573 F. Supp. 3d 711 (N.D.N.Y. 2021) (*Alexander II*).

Thereafter, in a separate order, without prompting from the County, the district court granted the County summary judgment. *Alexander v. County of Onondaga*, No. 5:17-cv-1195, 2022 WL 79642 (N.D.N.Y. Jan. 6, 2022) (*Alexander III*). Representing himself, Alexander now appeals.[1]

On appeal, Alexander principally argues that the district court impermissibly credited the defendants' version of events over his. We agree with

---

[1] From 2017 to 2020, Alexander was represented by counsel in the district court. After Alexander's attorney was elected to a state judgeship in 2020, the district court granted Alexander's attorney leave to withdraw. Alexander represented himself throughout the summary judgment proceedings.

Alexander, but only in part. Alexander raises triable issues of fact relating to the warrantless entry into his home, the ensuing search and prolonged seizure of the residence, and the legality of his arrest and prosecution for burglary. In addition, factual gaps in the record preclude summary judgment for the City and County with respect to Alexander's state law claims based on his continued detention after he posted bail twice. We therefore **VACATE** and **REMAND** the judgment of the district court in part, and **AFFIRM** the judgment in all other respects.

## BACKGROUND

### I. The Facts

Because this appeal arises from the grant of summary judgment, we present the facts in the light most favorable to Alexander, the non-movant. *Murphy v. Hughson*, 82 F.4th 177, 180 (2d Cir. 2023). Accordingly, we resolve all disputed facts and draw all reasonable inferences in his favor. *Id.*

#### A. The Search, Seizure, and Initial Charges

##### 1. Initial Report of Sexual Assault

We start with what SPD learned before they searched and seized Alexander's home. On Monday, October 24, 2016, a Syracuse hospital contacted the SPD to report that a patient, L.M., had been sexually assaulted. Two officers—Detective Thomas Lund and Officer Dustin Kiellach—received the call at 3:59 p.m. and went to the hospital.

After speaking with L.M., the officers learned that L.M. was a 19-year-old woman who lived near Alexander's house. They also learned that L.M. occasionally engaged in sex work, and that she allegedly paid Alexander so she could use one of his rooms for her escort services. L.M. also said that Alexander sold cocaine from his home.

Although L.M. was lethargic and drowsy, she was able to relay what she could remember from the previous day. She began by explaining that her friend, Samantha, lived in a room at Alexander's house. The day before, L.M. and Samantha went to Samantha's room to get some money. After they did so, L.M. tried to leave the premises. However, two women—S.W. and L.B.—obstructed her path and forced her into the basement. L.M. was then blindfolded, tied to a bench, and had her lips superglued together. The assailants stripped L.M. naked, burned her with cigarettes, and injected her more than ten times with what L.M. believed to be drugs. Thereafter, an unknown man raped her.

After the attack, S.W. and L.B. cleaned L.M. and threatened her. The two said that if L.M. spoke to the police about what happened, they would kill her. The captors then released L.M. Other than these specifics, L.M. was unable to recall additional details.

Erin Culhane, the friend who accompanied L.M. to the hospital, supplied some additional context. She explained that the day before, while L.M. was at

6

Alexander's house, Culhane was spending the night at L.M.'s residence to take care of someone else who lived there. At 4:45 a.m., Culhane saw L.M. come home, and she was completely naked. L.M. also appeared highly intoxicated and bled heavily from her groin. Concerned, Culhane said that she wanted to call the police, but L.M. dissuaded her and went to bed. When L.M. woke up, Culhane convinced her to go to the hospital.

Consistent with L.M. and Culhane's narratives, Detective Lund saw peeled skin on L.M.'s lips, as well as abrasions, scratch marks, burn marks, and needle marks on her body. A doctor also relayed that an X-ray image depicted a razor blade lodged in L.M.'s anal cavity. Further corroborating L.M.'s story, Culhane had brought L.M.'s bloody underwear to the hospital.

With this information in hand, Detective Lund contacted the SPD's Criminal Investigations Division (CID) to take further action. At around 5:00 p.m., two more officers arrived at the hospital. The newly arrived officers remained there, and Detective Lund left for Alexander's house.

### 2. Initial Entry, Search and Seizure of Alexander's House

Alexander owned the house where L.M.'s alleged assault occurred and lived there with five other people—three relatives (his mother, father, and brother) and two non-relatives (L.M.'s friend Samantha, and one of L.M.'s alleged attackers, S.W.).

7

After Detective Lund contacted CID, Detective Gilhooley was sent to Alexander's house to act as the lead investigator. By 6:50 p.m., Detective Gilhooley arrived at Alexander's house, and Detective Lund briefly recapped for him what L.M. and Culhane conveyed at the hospital. The two detectives and others then knocked on Alexander's door. A houseguest answered. The parties dispute what happened next.

According to Detective Gilhooley, the houseguest gave him permission to enter. But according to Alexander's houseguest, Detective Gilhooley and his fellow officers pushed their way in. Alexander's brother testified that the officers then went upstairs with their guns out. During the ensuing sweep, officers "wrecked" a room belonging to Alexander's father, rummaging through dresser drawers and dumping personal belongings onto a bed. Dist. Ct. Dkt. No. 119-7 at 22–25.[2] When officers encountered Alexander, they found him sitting on a toilet. The officers told Alexander to "get up" and go downstairs to the living room. Dist. Ct. Dkt. No. 119-2 at 92.

Once every occupant had gathered in the living room, Alexander told SPD to leave his house and get a warrant. The officers responded by surrounding the

---

[2] When quoting the summary judgment evidence, the parties' briefs, and case law, we omit all internal quotation marks, footnotes, ellipses, and citations, and accept all alterations, unless otherwise noted.

group in a horseshoe formation. By 8:00 p.m., SPD was escorting Alexander and the others out of the home; they were forced to leave their cellphones, wallets, and other belongings inside. One officer then stayed on the front porch to keep anyone else from entering.

### 3. Towing Alexander's Cars

The precise timing is unclear, but sometime before Alexander and his group were forced out of the house, Detective Gilhooley had already gone outside. He saw three cars—one covered and two uncovered. Detective Gilhooley shined his flashlight into the two uncovered cars and saw in each of them red spots that appeared to be blood. To preserve this potentially incriminating evidence, Detective Gilhooley had the two uncovered cars towed. Although the parties did not submit a visual depiction of the driveway, Detective Gilhooley testified that the towed cars were parked "roughly in the front, side and/or side of the house," in a "driveway area immediately in front of the house." Supp. App'x 108, 136 ¶ 18. From this description, it appears a wide driveway space laid directly in front of the entryway to Alexander's house. It also seems the driveway stretched from the front of the house and wrapped around the side, forming a large L-shape of sorts. Alexander does not appear to dispute this description, describing the area as a "parking lot." Dist. Ct. Dkt. No. 119-2 at 98. Based on this record, it seems

that the driveway was rather large; several people had access to it; and Alexander's visitors had to use the driveway to get to the house's entrance.

### 4. The Prolonged Seizure and Ongoing Search of Alexander's House

In total, SPD seized Alexander's house for over 20 hours—from before 8:00 p.m. on Monday, October 24, 2016 (when Alexander and his group were ordered outside) to 4:00 p.m. on Tuesday, October 25, 2016 (when SPD executed the search warrant). During that period, 12.5 hours passed between SPD's initial seizure of the home and Detective Gilhooley's submission of his warrant application to Syracuse City Court. During this 12.5-hour period, four events important to this appeal transpired.

First, while SPD towed Alexander's cars, Detective Gilhooley told Alexander, "This is what happens when you piss me off." Dist. Ct. Dkt. No. 119-2 at 95.

Second, shortly before 10:43 p.m., an SPD officer went inside Alexander's home and heard noise coming from upstairs. The officer followed the disturbance and found Tereia Duff, Alexander's cousin, trying to escape through a window. The officer apprehended her, and Duff wrote a sworn statement in which she stated that Alexander told her to go into the house and get his cellphone.

Third, the seizure of the house forced Alexander and other occupants to spend the night outside or find other arrangements. To stay warm, Alexander and

others started a fire pit. Alexander's brother accompanied Alexander for most of the evening. Throughout the night, while Alexander and others waited outside, officers changed shifts, and kept "going in the house," or "peek[ing] in." Dist. Ct. Dkt. No. 119-2 at 100–01. At 5:45 a.m., Alexander left so he could go to work.

Fourth, after Detective Gilhooley left the premises, and after he had Alexander's cars towed, Detective Gilhooley returned to the CID office and drafted the warrant application. At 10:00 p.m., his shift ended, and he went home for the night. Detective Gilhooley did not explain why he did not request a warrant before leaving for the night. As set forth more fully below, the application was relatively straightforward and required minimal drafting on Detective Gilhooley's part.

The next morning, Detective Gilhooley finalized the application and submitted it to the Syracuse City Court at 8:30 a.m. One hour and forty-five minutes later, a judge issued a warrant authorizing officers to search and seize evidence from Alexander's home.

### 5. Alexander's Arrest on the Burglary Charges

Armed with the warrant, Detective Gilhooley left for Alexander's house and arrived around 11:00 a.m. Alexander got back from his work shift sometime between 12:00 and 1:00 p.m. As Alexander approached his house, he saw Detective Gilhooley dump a pot of water on his family's firepit while arguing with

11

Alexander's sister. Angered, Alexander said, "That's it," and walked towards a nearby corner store to get video footage of the preceding events. Dist. Ct. Dkt. No. 119-2 at 103. When he did so, Detective Gilhooley and another SPD detective tackled Alexander and arrested him on four charges: second-degree burglary under New York Penal Law (NYPL) § 140.25, conspiracy to commit second-degree burglary under NYPL § 105.10, facilitating second-degree burglary under NYPL § 115.00, and soliciting second-degree burglary under NYPL § 100.05. [3] (To simplify our discussion, we collectively refer to these four charges as "the burglary charges.") Detective Gilhooley premised his arrest on the theory that when Alexander asked Duff to enter the house and get his cellphone after the SPD had seized the house, Alexander participated in a burglary of his own home. After the arrest, Alexander was taken downtown to CID's offices.

At 4:00 p.m., SPD officers finally executed the search warrant. (It's unclear why the officers took so long to execute the warrant, given that Detective Gilhooley delivered it at 11:00 a.m.) Some 30 minutes later, the officers completed their search, and they seized a "[b]eige chunky substance," three scales with white residue, a bottle of Inositol (a cutting agent), hundreds of small plastic bags, and

---

[3] New York classifies second-degree burglary as a Class C felony. *See* NYPL § 140.25. Although the conspiracy, facilitation, and solicitation statutes charged do not specifically name second-degree burglary, they all cover Class C felonies. *See* NYPL § 105.10(1) (covering class C felonies); *id.* § 115.00 (same, but all felonies); *id.* § 100.05 (same).

personal papers with Alexander's name on them. Supp. App'x 222. The items were all found in Alexander's bedroom. A field test on the chunky substance and white powder yielded a positive reading for cocaine.

### 6. Alexander's Initial Pretrial Detention

Meanwhile, at the CID office, Detective Gilhooley tried to cut a deal with Alexander, saying:

> I'm going to give you 15, 20 minutes to think about this. We need some information from another case that you could help us on. If you help us, we'll make this all go away. If not, we're going to bury you.

Dist. Ct. Dkt. No. 119-2 at 110.

Alexander declined the offer, and he was formally booked in the Onondaga County Justice Center on the burglary and drug-related charges.[4] A somewhat complicated series of formal criminal proceedings followed.

*       *       *

The above narrative includes a lot of dates and times because in this appeal, timing matters. We summarize the key events viewed in the light most favorable to Alexander in the table below.

---

[4] In his deposition, Alexander said he was booked in the Justice Center "for burglary of [his] own house" and "possession of drugs." Dist. Ct. Dkt. No. 119-2 at 110. But when he filed his response to the City and Detective Gilhooley's Rule 56.1 Statement, he denies generally that "he was booked at the same time of all charges that day." Supp. App'x 343 ¶ 147. We assume for purposes of this summary judgment motion that Alexander was booked on both the burglary and drug-related charges on the same day.

| Day | Date | Time | Event |
|---|---|---|---|
| Mon. | Oct. 24 | 4:45 a.m. | L.M. arrives home after the assault. |
| | | Afternoon | L.M. goes to the hospital. |
| | | 3:59 p.m. | The hospital calls SPD. Detective Lund and Officer Kiellach respond, and they interview L.M., Culhane, and hospital staff. |
| | | 5:00 p.m. | Two more officers arrive at the hospital, and Detective Lund goes to Alexander's house. |
| | | 6:50 p.m. | Detective Gilhooley arrives at Alexander's house and speaks with Detective Lund. He then enters Alexander's home without consent or a warrant. |
| | | 8:00 p.m. | Alexander's cars are towed, and Alexander and his home's occupants are forced outside. Detective Gilhooley leaves for the CID office to draft a search warrant application. |
| | | 10:00 p.m. | Detective Gilhooley's shift ends, and he goes home without having requested a warrant. |
| | | 10:43 p.m. | Officers catch Duff inside Alexander's bedroom. She fills out a sworn statement. |
| Tues. | Oct. 25 | 5:45 a.m. | After spending the night outside, Alexander leaves for work. |
| | | 8:30 a.m. | Detective Gilhooley submits his search warrant application. |
| | | 10:15 a.m. | A judge issues the search warrant. |

| | |
|---|---|
| 11:00 a.m. | Detective Gilhooley gives a copy of the warrant to officers at Alexander's house. |
| Between 12:00 and 1:00 p.m. | Alexander arrives home from work, and Detective Gilhooley arrests him on the burglary charges.  Alexander is transported to CID. |
| 4:00 p.m. | Officers execute search warrant. |
| 4:30 p.m. | Officers discover narcotics and drug paraphernalia in Alexander's room. |
| Unknown | Detective Gilhooley formally books Alexander into the Justice Center on the burglary and drug charges. |

\*     \*     \*

B. *Alexander's Pretrial Detention*

On Wednesday, October 26, 2016—the day after Detective Gilhooley booked Alexander in the County's Justice Center—the Syracuse City Court arraigned him on the burglary and drug charges and fixed bail at $100,000.  Because Alexander did not post bail at that point, he remained in custody.  Two days passed.

On Friday, October 28, 2016, L.M. spoke with County authorities and alleged, for the first time, that Alexander personally participated in her sexual assault, and that other men were also involved.  (Recall that at the hospital, L.M. said only one man attacked her, and she did not implicate Alexander in the

15

incident.) Later that day, L.M. testified before a grand jury convened by the County, and she stated that Alexander was among the men who imprisoned and raped her. Because the government wanted to present another witness the following Monday, the proceedings were continued, and the grand jury did not return an indictment that day.

The next day, Saturday, October 29, 2016, Alexander posted bail for his burglary and drug charges. The documentary evidence includes a release order signed by a City Court judge acknowledging receipt of $50,000 in connection with the drug charges, and one signed by the County Court acknowledging receipt of $50,000 in connection with the burglary charges. The release orders are dated October 29; the record does not indicate what time of day they were signed. The County Justice Center did not release Alexander that day. However, the record shows that at 12:30 p.m., the County arrested Alexander for committing a criminal sexual act in the first degree, in violation of NYPL § 130.50 (the "sexual assault charge").

Alexander testified that on the morning of Sunday, October 30, 2016, he was arraigned on the sexual assault charge, and the court fixed bail at $500,000. The documentary evidence reflects that he was arraigned in the Syracuse City Court, and then the case was transferred to the County Court. Four days later, on Thursday, November 3, 2016, the County Court reduced Alexander's bail to

16

$100,000. That same day, Alexander posted bail for the second time. Like the first bail posting, the precise time that Alexander posted bail is unknown.

The next day, on Friday, November 4, 2016, the County's grand jury charged Alexander with unlawful imprisonment under NYPL § 135.10 arising from the assault on L.M. The summary judgment record does not show when Alexander was arraigned on the unlawful imprisonment charge.

Further, it's not clear when Alexander was actually released after making bail. In his live pleading, which was filed by Alexander's prior attorney, he alleges that a counseled habeas corpus motion prompted his release on Monday, November 7, 2016. Defendants did not proffer any summary judgment evidence on this matter, and the record contains conflicting testimony by Alexander. In his deposition, when Alexander was representing himself, he testified that he was released on the evening of Friday, November 4, 2016. But during a small claims proceeding that occurred closer in time to the incidents at issue, Alexander testified that he was released on November 7. Because we must afford Alexander "special solicitude" as a self-representing litigant, *Kravitz v. Purcell*, 87 F.4th 111, 119 (2d Cir. 2023), and because defendants have not marshaled any evidence on the question, we presume at this stage that the County Justice Center released Alexander on November 7, 2016.

\* \* \*

17

As before, we summarize the above events in a table.

| Day | Date | Event |
| --- | --- | --- |
| Tues. | Oct. 25 | Alexander is booked in the County's Justice Center on City charges of burglary and drug offenses. |
| Wed. | Oct. 26 | The City arraigns Alexander on the burglary and drug charges. The City Court fixes bail at $100,000. Alexander does not post bail that day. |
| Fri. | Oct. 28 | L.M. implicates Alexander in her sexual assault, first to County authorities, then to a County grand jury. |
| Sat. | Oct. 29 | At 12:30 p.m., Alexander is arrested on the County's sexual assault charge. At an unknown time, Alexander posts $50,000 bail with the City Court for the drug charges and $50,000 with the County Court for the burglary charges. Alexander is not released that day. |
| Sun. | Oct. 30 | Alexander is arraigned on the sexual assault charge. Bail is set at $500,000. |
| Thurs. | Nov. 3 | A County Judge reduces bail on the sexual assault charge to $100,000. At an unknown time, Alexander posts bail. Alexander is not released. |
| Fri. | Nov. 4 | The County's grand jury indicts Alexander on the unlawful imprisonment charge. |
| Mon. | Nov. 7 | Alexander is released. |

*       *       *

After all this, the criminal proceedings terminated in Alexander's favor. At some point, the County District Attorney dismissed the burglary charges,

concluding that proving a burglary case based on an entry into one's own home would be difficult. And Alexander agreed to plead guilty to an unrelated criminal matter in exchange for dismissal of the drug charges. With respect to the sexual assault and unlawful imprisonment charges, almost one year after the events outlined above, the County District Attorney's investigation could not tie Alexander to L.M.'s assault, and the prosecution moved to dismiss the case. Thus ended the saga underlying Alexander's claims in this civil action.

## II.   Procedural History

In 2017, Alexander commenced this lawsuit against the City, County, and Detective Gilhooley.[5] More than a year later, Detective Gilhooley and the City jointly filed a motion to dismiss, which the district court granted in part. *Alexander I*, 2018 WL 6591426, at *11–12. The parties then proceeded to discovery. By the time Detective Gilhooley and the City sought summary judgment, a number of constitutional claims under 42 U.S.C. § 1983 remained pending against Detective Gilhooley and the County.[6] In addition, three New York state law claims

---

[5] Alexander also sued L.M. but voluntarily dismissed his claims against her because she had died in April 2018 due to an apparent drug overdose.

[6] On the City's motion to dismiss, the district court dismissed all § 1983 claims against the City. *Alexander I*, 2018 WL 6591426, at *11. Alexander does not challenge this ruling on appeal.

19

remained pending against Detective Gilhooley, the City, and the County. *Alexander II*, 573 F. Supp. 3d at 728 & nn.10–11.

As relevant to this appeal, Alexander bases his § 1983 claims on: (1) Detective Gilhooley's warrantless, nonconsensual entry into and search and seizure of Alexander's home; (2) Detective Gilhooley's direction to other officers to seize Alexander's home on a prolonged basis while he sought a search warrant; (3) Detective Gilhooley's shining his flashlight through the windows of Alexander's two cars;[7] (4) Detective Gilhooley's allegedly false arrest of Alexander on the burglary charges; (5) the allegedly malicious prosecutions of Alexander on the burglary, drug, sexual assault, and unlawful imprisonment charges; and (6) the delay of Alexander's pretrial release after Alexander posted bail on two occasions.[8] Alexander's three state law claims, and his claims against the City and

---

[7] Alexander also argued to the district court that the towing of his two cars violated his constitutional rights. The district court rejected this argument. *Alexander II*, 573 F. Supp. 3d at 733–34. Because Alexander does not discuss this ruling in his appellate brief , he has abandoned any challenge to it. *See King v. Aramark Services Inc.*, 96 F.4th 546, 562 n.7 (2d Cir. 2024).

[8] In their motion for summary judgment, Detective Gilhooley and the City did not brief Alexander's over-detention claims, even though Alexander's live pleading alleged that he posted bail twice and claimed the defendants "continued to hold" him "until [his] counsel filed a habeas corpus motion to get him released." Supp. App'x 10 ¶ 70. Because Alexander represented himself at the summary judgment stage, the district court afforded him "deference" and evaluated the over-detention claims on its own accord. *Alexander II*, 573 F. Supp. 3d at 728 n.11. Given that Alexander's response brief in the trial court and his opening brief in this Court continues to take issue with his delayed release, we consider his over-detention claim preserved for appellate review.

County, are premised on the latter three events. Detective Gilhooley defended against all of Alexander's claims on the merits.[9]

In a lengthy opinion, the district court granted Detective Gilhooley and the City's motion for summary judgment in full. *Alexander II*, 573 F. Supp. 3d at 741. In so doing, the district court assessed the § 1983 claims under the Fourth Amendment and held that, with respect to the initial warrantless entry and 12.5-hour seizure, exigent circumstances justified Detective Gilhooley's actions. *See id.* at 731–32. It also held that shining a flashlight into a vehicle did not amount to a Fourth Amendment search, and thus, Detective Gilhooley's actions did not violate the Constitution. *Id.* at 733. And, because Duff's sworn statement established probable cause for the burglary charges, Alexander could not prevail on his false arrest claim relative to the burglary charge. *Id.* at 735. In addition, after concluding

---

[9] Qualified immunity has not been core to the proceedings so far and we need not at this juncture assess whether Gilhooley is protected from any of Alexander's claims by qualified immunity. The City of Syracuse and Detective Gilhooley's amended answer asserts in a single sentence qualified immunity for "[a]ny and all acts." Dist. Ct. Dkt. No. 8 ¶ 99. In summary judgment briefing, Detective Gilhooley argued, in the alternative, that he was entitled to qualified immunity because of, among other things, "*arguable* probable cause." Dist. Ct. Dkt. No. 119-48 at 24. However, the district court did not rule on the basis of qualified immunity. Moreover, Detective Gilhooley has not argued qualified immunity in briefs or during oral arguments before this Court, and therefore could be construed to have forfeited this argument. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (noting that this Court "ordinarily deem[s] an argument to be forfeited where it has not been sufficiently argued" before it); *Fabrikant v. French*, 691 F.3d 193, 211–12 (2d Cir. 2012) (noting that "the defense of qualified immunity can indeed be forfeited"); *Maye v. City of New Haven*, 89 F.4th 403, 407 (2d Cir. 2023) (noting that a litigant's failure to diligently pursue the qualified immunity affirmative defense may "cost it its 'immunity from suit,' leaving it with 'a mere defense to liability'" which may ordinarily be forfeited (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985))).

that probable cause supported *all* of the criminal charges against Alexander, the district court ruled that no reasonable jury could render a verdict on Alexander's malicious prosecution claims.  *Id.* at 737–41.

As for Alexander's over-detention claim, the district court characterized it as a Fourth Amendment claim of false arrest.  *Id.* at 736.  The district court concluded that the evidence did not support such a claim because Alexander's release orders did not say his discharge should be "immediate;" he was arraigned on new charges within 48 hours of the extension of his detention;[10] and the first bail posting was to the City Court, so the County Court still had the right to hold Alexander in custody thereafter.  *Id.* at 736–37.  The district court thus dismissed all claims against Detective Gilhooley and the City.  *Id.* at 741–42.

At the end of its opinion, the district court acknowledged that for the entirety of the lawsuit, the County "made little effort" to defend itself, as it had neither filed a motion to dismiss nor a motion for summary judgment.  *Id.* at 728 n.10, 741.  Pursuant to Federal Rule of Civil Procedure 56(f)(1), the district court warned the parties that it planned to enter summary judgment for the County on

---

[10] Before its decision in *County of Riverside v. McLaughlin*, the Supreme Court held that if the government arrests an individual without a warrant, the Fourth Amendment requires the arrestee be "promptly" "brought before a neutral magistrate for a judicial determination of probable cause."  500 U.S. 44, 53 (1991).  To help "provide some degree of certainty" on what would be considered prompt, the Court held in *McLaughlin* that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter," suffice.  *Id.* at 56.

22

its own accord. *Id.* at 741. The County filed a short, cursory letter of non-opposition, and Alexander filed his own letter of opposition. In a brief opinion that largely adopted its prior summary judgment reasoning by reference, the district court entered summary judgment for the County and terminated it from the lawsuit. *Alexander III*, 2022 WL 79642, at *1–3.

Alexander then filed this timely appeal. Although the City and Detective Gilhooley filed response briefs, the County did not submit a response brief or present oral argument.

## DISCUSSION

We review a district court's award of summary judgment without deference. *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021). A district court may only grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And where a defendant moves for summary judgment, if the defendant has not met its burden of production to show an absence of a genuine dispute of material fact, "summary judgment must be denied *even if no opposing evidentiary matter is presented.*" *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (emphasis in original). That is so because "no defense to an insufficient showing is required." *Id.*

23

Because Alexander is the nonmovant, we must construe the record in the light most favorable to him, resolving all factual disputes and drawing all reasonable inferences in his favor. *Murphy*, 82 F.4th at 180. Additionally, because Alexander appears before us as a self-represented litigant, we afford him "special solicitude," meaning we will liberally construe his filings and read them to raise the strongest arguments that they suggest. *Kravitz*, 87 F.4th at 119.

Below, we start with Alexander's claims against Detective Gilhooley for Fourth Amendment violations in connection with the warrantless search and seizure of his home and looking into his car windows. We then consider his claims for false arrest and malicious prosecution, and, finally, his claims based on his continued detention after he met bail.

As we explain more fully below, the district court erred when it granted summary judgment for Detective Gilhooley in connection with Alexander's Fourth Amendment claim based on the initial search and on the ensuing prolonged seizure and further search of Alexander's home. In addition, because the probable cause to arrest Alexander for burglary depended on the validity of the seizure of his home, the district court erred in granting Detective Gilhooley summary judgment on the Fourth Amendment and New York claims of false arrest and malicious prosecution based on the burglary charge. By extension, due to the City's potential vicarious liability, the district court erred in granting the

24

City summary judgment on the state law claims arising from the burglary arrest and prosecution. Finally, we conclude that there is insufficient evidence in the record to award the City or County summary judgment on Alexander's state law false imprisonment claims based on his over-detention. In all other respects, we affirm the judgments for all defendants.

## I. Detective Gilhooley's Search and Seizure of Alexander's Home[11]

### A. The Initial Warrantless Entry into and Search of Alexander's Home

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Because the home is the "first among equals" in the Fourth Amendment's eyes, *Florida v. Jardines*, 569 U.S. 1, 6 (2013), warrantless searches of a private dwelling are "presumptively unreasonable," *United States v. Simmons*, 661 F.3d 151, 156–57 (2d Cir. 2011). *See also Groh v. Ramirez*, 540 U.S. 551, 559 (2004) ("Because the right of a [person] to retreat into [the] home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment, our cases have firmly established the basic principle of

---

[11] Alexander does not on appeal challenge the district court's judgment for the City on his § 1983 claims arising from Detective Gilhooley's search and seizure of his home and vehicles, and he did not allege County involvement in that conduct. So this analysis relates solely to claims against Detective Gilhooley.

Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.").

To surmount this presumption of unreasonableness, the government must show that one of the "reasonable exceptions" to the warrant requirement applies. *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018). Here, two exceptions potentially come into play—consent and exigent circumstances. Given that a houseguest testified that officers "pushed [their] way in[to] the house," App'x 240, for purposes of this appeal we must accept that Detective Gilhooley never got consent to enter Alexander's home. The question, then, is whether a rational jury could find that no exigency existed to support a warrantless entry. We say yes.

The exigent circumstances exception applies when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460 (2011). Intended for "now or never" situations, the exception authorizes warrantless entries to, for example, "render emergency assistance to an injured occupant," "protect an occupant from imminent injury," "prevent the imminent destruction of evidence," or "prevent a suspect's escape" when there is "no time to secure a warrant." *Lange v. California*, 594 U.S. 295, 301–02 (2021); *see also United States v. Caraballo*, 831 F.3d 95, 102 (2d Cir. 2016). To benefit from the exception, an officer must have probable cause to believe an exigency exists. "The core question is

26

whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or to take action" without securing a warrant. *Chamberlain Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 106 (2d Cir. 2020).

Because this exception must be "jealously and carefully drawn," *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971), officers "bear a heavy burden" to show that an exigency justified a warrantless entry. *Chamberlain*, 960 F.3d at 106. Additionally, any warrantless searches and seizures must be "strictly circumscribed" to ameliorate the exigency at issue. *Id.* In other words, once the exigency ends, any additional warrantless search or seizure "is no longer permissible." *Id.* at 107; *see also United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015) (noting the exigent circumstances exception "does not immunize . . . lengthy, warrantless seizure[s]").

The district court concluded that no reasonable jury could find for Alexander on the claim that Detective Gilhooley violated the Fourth Amendment when he entered Alexander's home and searched it without a warrant. *See Alexander II*, 573 F. Supp. 3d at 731. This was error for two reasons. First and foremost, there is no evidence that Detective Gilhooley had any indication that evidence destruction was occurring in real time as he stood at the threshold before forcing his way in. Second, the passage of time between L.M.'s initial report at the

27

hospital and Detective Gilhooley's warrantless entry—almost three hours—undermines any suggestion that there wasn't sufficient time to secure a warrant. In light of these considerations, neither the severity of the crime under investigation nor the existence of probable cause to believe he would find evidence of a crime on the premises gave rise to exigent circumstances supporting Detective Gilhooley's warrantless entry into Alexander's home.

### 1. Real Time Evidence Destruction

If an officer invokes the exigent circumstances exception to justify a warrantless entry to search for and preserve evidence, the bar is high.[12] The threatened destruction of evidence must be "imminent." *Lange*, 594 U.S. at 301. For that reason, the exigent circumstances exception typically applies when an officer has reason to believe evidence inside a private dwelling is being destroyed or removed *in real time*.

---

[12] We have often relied on six factors to determine whether exigent circumstances support a warrantless entry to *apprehend a suspect*: "(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry." *Harris v. O'Hare*, 770 F.3d 224, 234 (2d Cir. 2014). Although these factors are informative, they "are not directly applicable to recovery of property scenarios because there is no specific suspect of interest." *Id.* In this context, we thus focus our analysis on "whether quick action [was] necessary to prevent the destruction of evidence." *Id.* at 234–35.

Take, for example, our decision in *United States v. Medina*, 944 F.2d 60 (2d Cir. 1991). There, an undercover informant and four suspects went into an apartment to execute a drug deal. *Id.* at 63. The government informant was the seller, and the four suspects were the buyers. *Id.* After one suspect produced almost $47,000 in cash, the informant asked two other suspects to go outside and help him bring cocaine into the apartment. *Id.* Once the three left the apartment, federal agents arrested the two unwitting suspects. *Id.* The agents then made their way to the apartment, knocked on the door, and announced that they were police officers. *Id.* In response, they heard "scuffling noises" and conversations in Spanish. *Id.* The agents forced their way into the home with a battering ram. *Id.*

On appeal, we held that exigent circumstances justified the warrantless entry. *Id.* at 68. We noted that, given the situation, the two purchasers who waited inside the apartment clearly expected the informant and their two confederates to return with the cocaine in a short amount of time. *Id.* at 69. A prolonged delay would have clearly sounded alarm bells. *Id.* Plus, when agents knocked on the door and identified themselves, the occupants' reactions indicated an attempt to escape, destroy evidence, or engage in other unlawful activity. *Id.* Under these circumstances, we held that "it was objectively reasonable to conclude that immediate entry was necessary to prevent the destruction or hiding" of the evidence and "the escape of the suspects." *Id.*

Our caselaw is rife with similar examples of exigent circumstances. *See, e.g.,* *United States v. Andino*, 768 F.3d 94, 96 (2d Cir. 2014) (agents heard a faucet begin to run in response to a knock); *United States v. Klump*, 536 F.3d 113, 118 (2d Cir. 2008) (firefighter smelled a burning odor upon arrival); *United States v. MacDonald*, 916 F.2d 766, 770 (2d Cir. 1990) (en banc) (agents had an urgent need to prevent the loss of evidence given that "the suspects were using an unidentified apartment in the building to store narcotics, the ease with which the suspects could have disposed of the cocaine by flushing it down the toilet, and the possibility that the prerecorded five dollar bill used . . . in the undercover buy would be lost if the ongoing drug transactions were permitted to continue while the agents sought a warrant"); *United States v. Farra*, 725 F.2d 197, 198 (2d Cir. 1984) (agents heard sounds of "stirring about" and slamming drawers in response to knocking); *United States v. Gomez*, 633 F.2d 999, 1006 (2d Cir. 1980) (agents heard commotion and sounds of a flushing toilet).

Here, no similar evidence of imminent evidence destruction presented itself when Detective Gilhooley stood on the threshold of Alexander's home and forced his way in. Recall that L.M. and Culhane suggested that the attack on L.M. occurred before 4:45 a.m.—*over 12 hours before* Detective Gilhooley arrived at Alexander's doorstep at 6:50 p.m. Though L.M. reported that the women who had attacked her had subsequently cleaned her up in the pre-dawn hours of the

30

morning, Detective Gilhooley did not have any indication that evidence destruction was still underway in real time some 12 hours later.

Nor did an exigency present itself at the moment before Detective Gilhooley pushed his way into the house. The summary judgment record is bereft of any indicia that Detective Gilhooley perceived any sights or sounds in response to his knocking that would have suggested Alexander and the other occupants were destroying evidence in real time.[13]

2. Delayed Action

In addition, the time lapse between L.M.'s interview with officers at the hospital and Detective Gilhooley's warrantless entry belies the suggestion that there was no time to get a warrant. The exigent circumstances exception applies in "situations presenting a 'compelling need for official action and *no time to secure a warrant.*'" *Lange*, 594 U.S. at 301 (emphasis added) (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). Notably, approximately three hours passed between Detective Lund's interviews at the hospital and Detective Gilhooley's warrantless entry. In that time period, Detective Lund didn't even try to seek a warrant. And

---

[13] Our conclusion on this point isn't surprising. Detective Gilhooley doesn't argue that his warrantless *entry* was justified on the basis of exigent circumstances. He contends that his initial entry was *consensual*; by his own telling, it was only *after* he entered the house that exigent circumstances arose to support his subsequent actions; in particular, he encountered a resident named "Samantha."

no new information came to light to create an exigency during that time. Although Alexander asserts his claim against Detective Gilhooley and not Detective Lund, the time gap nevertheless cuts against a finding that there was "no time to secure a warrant." *Id.*; *see also United States v. Gallo-Roman*, 816 F.2d 76, 81 (2d Cir. 1987) (exigent circumstances exception applied, in part, because "a mere twenty minutes" was an "unrealistic" amount of time to secure a warrant).

Thus, after reviewing the record in the light most favorable to Alexander, we conclude that a reasonable jury could find that no exigency justified a warrantless entry, search, and seizure of Alexander's home. On this record, the fact that Detective Gilhooley had probable cause to expect that evidence of a heinous crime would be found in the house was not by itself enough to justify the warrantless entry, notwithstanding the horrific nature of the suspected crime. *See Groh*, 540 U.S. at 559 ("[A]bsent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within."). We are not persuaded otherwise by the dissent. Much of the daylight between our view and the dissent's stems from different descriptions of the record, rather than divergent understandings of the law. At this stage of the case, we must view the summary judgment record in the light most favorable to

Alexander and cannot rely on disputed allegations and inferences favorable to the defendants. *Murphy*, 82 F.4th at 180.

But to the extent that the dissent suggests that Detective Gilhooley's conduct in purportedly "securing" Alexander's house while seeking a warrant is not a search or seizure for Fourth Amendment purposes, and is thus exempt from the exigent circumstances (or consent) analysis, we do see the law differently. As reflected in the above analysis, such a seizure *may* be constitutional if supported by one of the "reasonable exceptions" to the warrant requirement. *Iverson*, 897 F.3d at 458. But even if the record properly viewed supported the dissent's suggestion that Detective Gilhooley merely "secure[d]" the house to prevent destruction of evidence, Dissent at 7, there is no separate "securing-the-premises" category of law enforcement activity that is exempt from Fourth Amendment scrutiny.[14] *See, e.g.*, *Illinois v. McArthur*, 531 U.S. 326, 330–33 (2001) (assessing the constitutionality of law enforcement officers' securing a home while seeking a search warrant pursuant to the exigent circumstances framework).

---

[14] Nor do we find any support in the law for the dissent's assertion that Detective Gilhooley's forcible exclusion of Alexander and others from his house was not a seizure because the City of Syracuse did not assert title to the property. Dissent at 6–7. *Cf. United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020) ("A 'seizure' of personal property occurs for purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interests in their property.").

In fact, the cases the dissent relies on reinforce that the "exigent circumstances" framework applies in assessing the constitutionality of officers taking control of premises or property for purposes of securing them pending receipt of a warrant. For example, in *Segura v. United States*, the Supreme Court considered a case in which officers entered an apartment without a warrant, arrested occupants in connection with suspected drug distribution, and remained in the apartment to secure it while others sought a warrant. 468 U.S. 796 (1984). The defendants sought to suppress items officers found the next day, pursuant to a lawful warrant that did not rely on information gained through the initial entry, arguing that the officers' securing the apartment amounted to an unlawful seizure of the contents of the apartment. *Id.* at 805–06. The Supreme Court assumed that the initial entry was unlawful, but concluded that securing the premises from the inside rather than the outside did not constitute an unlawful seizure requiring suppression of evidence later found pursuant to a valid warrant. *Id.* at 811, 813. The Court's rejection of the argument that its holding would incentivize illegal entries is telling:

> In the first place, an entry in the absence of exigent circumstances is illegal. . . . Second, as a practical matter, officers who have probable cause and who are in the process of obtaining a warrant have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry. Third, officers who enter illegally will recognize that whatever evidence they discover as a direct result of the entry may be suppressed . . . . Finally,

*if officers enter without exigent circumstances to justify the entry, they expose themselves to potential civil liability under 42 U.S.C. § 1983.*

*Id.* at 811–12 (emphasis added). In addition, the Court recognized that "a seizure reasonable at its inception . . . based upon probable cause may become unreasonable as a result of its duration or for other reasons." *Id.* at 812. Far from supporting the dissent's position, *Segura* reinforces that officers can only enter premises to secure them while they seek a warrant if exigent circumstances allow, and that the reasonableness of seizing property by "securing" it is context dependent.

Likewise, in *United States v. Smith*, this Court held that police could seize personal property without a warrant "to prevent its destruction or disappearance"—that is, under exigent circumstances—while they seek a warrant. 967 F.3d 198, 205 (2d Cir. 2020). *See also United States v. Picariello*, 568 F.2d 222, 226 (1st Cir. 1978) (concluding that FBI agents "made a justifiable assessment of exigent circumstances in their decision to secure defendant's apartment pending the arrival of the search warrant" and distinguishing a case in which officers had probable cause for a search and seizure but unreasonably delayed obtaining a warrant); *United States v. Guidry*, 534 F.2d 1220, 1223 (6th Cir. 1976) (holding that warrantless entry of premises was constitutionally permissible on the basis of an "exigent circumstance" where officers had evidence that "efforts to destroy

evidence were in progress and would be likely to be completed absent prompt action in entering the premises").[15]

The district court thus erred when it awarded Detective Gilhooley summary judgment on this Fourth Amendment-based § 1983 claim.

### B. *The Prolonged Seizure of Alexander's Home and Further Search*

Likewise, the district court erred when it granted summary judgment on Alexander's § 1983 claim based on the lengthy seizure of his home.  Even if a jury concluded that exigent circumstances justified Detective Gilhooley's *initial* entry and search, a jury could find facts supporting the conclusion that Detective Gilhooley's subsequent prolonged seizure of the house, and the continuing warrantless search during that time, was unreasonable.

In a case in which exigent circumstances supported seizure of an individual's home while an officer sought a warrant, the Supreme Court "balance[d] the privacy-related and law enforcement-related concerns to

---

[15] The "protective sweep" cases cited by the dissent to justify the warrantless search of rooms in Alexander's home are likewise inapposite because they presume that law enforcement is lawfully on the premises to begin with—a condition that doesn't apply here.  Dissent at 11–13. *See United States v. Miller*, 430 F.3d 93, 95 (2d Cir. 2005) ("We conclude that an officer *in a home under lawful process*, such as an order permitting or directing the officer to enter for the purpose of protecting a third party, may conduct a protective sweep when the officer possesses articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the scene." (emphasis added)); *United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983) (concluding that officers lawfully on premises pursuant to a warrant were entitled to make a limited security check of the premises).

determine whether the intrusion was reasonable" under the Fourth Amendment. *McArthur*, 531 U.S. at 331. In *McArthur*, police officers had accompanied a woman to the trailer she shared with her husband, McArthur, to keep the peace while she retrieved her belongings. *Id.* at 328. The officers remained outside while she collected her possessions. *Id.* at 329. When she emerged, she told them that her husband had just slid some "dope" under the couch. *Id.* A police officer knocked on the door, repeated what the wife had said, and asked for permission to search the residence. *Id.* After McArthur declined, one officer left to seek a warrant, and the other told McArthur, who by that time was on the porch, that he could not reenter the trailer unless he was accompanied by a police officer. *Id.* During the ensuing hour and 45 minutes, McArthur reentered the trailer two or three times (to get cigarettes or make phone calls) while the officer stood just inside the door and observed. *Id.* When the second officer returned with the warrant, the officers searched the trailer and found drug-related contraband under the couch. *Id.*

The Supreme Court concluded that the seizure was supported by exigent circumstances, and was "tailored to that need, being limited in time and scope." *Id.* at 331. In so concluding, the Court emphasized that law enforcement had reasonably balanced their "law enforcement needs with the demands of personal privacy." *Id.* at 332. In particular, they didn't search the trailer, left McArthur's home and belongings intact until they had a warrant, and allowed McArthur to

enter his trailer under observation. *Id.* Moreover, the police imposed this restraint for a little less than two hours. *Id.* The Court noted, "As far as the record reveals, this time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id.*

In this case, viewing the evidence in the light most favorable to Alexander, the balance tips the other way. The strength of Alexander's privacy interest in his home, the total exclusion of Alexander combined with the extent of the pre-warrant search, and the duration of the prolonged seizure all support Alexander's claims. *Cf. Smith*, 967 F.3d at 206 (in context of seizure of computer tablet, identifying four factors for assessing the reasonableness of the delay in securing a warrant: the length of the delay, importance of the seized property, whether the individual had a reduced property interest, and the strength of the government's justification for the delay).

First, the importance of Alexander's interest. We've covered this already. "Freedom in one's own dwelling is the archetype of the privacy protection secured by the Fourth Amendment," and "physical entry of the home is the chief evil against which it is directed." *Lange*, 594 U.S. at 303. The Fourth Amendment's "very core" includes the right "to retreat into [one's] own home and there be free from unreasonable government intrusion." *Jardines*, 569 U.S. at 6. Moreover, this Court has recognized that these principles apply with "particular intensity" when

38

a home is searched at night. *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011). There is no question that the importance to Alexander of the seized property—his home—is high.

Second, Detective Gilhooley did not simply ask Alexander to remain outside unless accompanied by police officers while he entered his house to retrieve possessions. Rather, Alexander was completely excluded from his home. At the same time, Detective Gilhooley did not just establish a perimeter around the house, leaving its contents untouched while awaiting a warrant. The record includes evidence that upon entering the house, the officers under Detective Gilhooley's direction conducted a room-by-room search, opening drawers and throwing residents' belongings around, even *after* the residents were removed from their rooms. Then, after excluding Alexander and others, officers repeatedly came in and out of the house. Once officers had removed the occupants from their rooms, thereby eliminating the possibility of them destroying evidence in those rooms, there was no plausible justification for them to enter the rooms without a warrant. *See id.* at 157–58 (holding that once officers eliminated possibility of evidence destruction or danger by separating individual from a gun, "there simply was no 'urgent need' to further search the home" without a warrant). And once the occupants of the home were removed to the outdoors, there was no reason for the officers to enter the house without a warrant.

39

And most importantly, the length of the delay and the lack of diligence in securing a warrant tips heavily against Detective Gilhooley. "The right of the police to temporarily seize a person's property pending the issuance of a search warrant presupposes that the police will act with diligence to apply for the warrant." *Smith*, 967 F.3d at 205; *see also Cosme*, 796 F.3d at 235 (exigent circumstances exception "does not immunize . . . lengthy, warrantless seizure[s]").

This imperative is particularly critical upon the seizure of a home. As the Tenth Circuit has emphasized,

> [A]fter seizing a home without a warrant, an officer *must make it a priority* to obtain a search warrant that complies with the Fourth Amendment. This obligation requires the officer to act with diligence to present a warrant application to a judicial officer *at the earliest reasonable time . . . .*

*United States v. Elmore*, 101 F.4th 1210, 1219–20 (10th Cir. 2024) (emphasis added). The Supreme Court concluded in *McArthur* that the seizure's 1.75-hour duration was no longer than "reasonably necessary for the police, acting with diligence, to obtain the warrant." 531 U.S. at 332. The same cannot be said here. The sheer passage of time, the fact that Detective Gilhooley went home for the night in the midst of the seizure, and the lack of any explanation for the delay undermine his claim that the seizure was constitutionally permissible.

40

Detective Gilhooley left Alexander's home to prepare his warrant request at 8:00 p.m. He didn't submit it to a court until 8:30 the next morning—12.5 hours later. In a similar case, the Tenth Circuit concluded that a delay of *eight* hours was unreasonable under the Fourth Amendment. *Elmore*, 101 F.4th at 1214. In *Elmore*, officers secured a home while they sought a search warrant after they learned that a teenager had overdosed on unlawfully obtained controlled substances. *Id.* at 1214–15. During that time—from 11:30 a.m. to 7:30 p.m.—officers refused to let the teenager's mother, father, or young sibling enter the home with a police escort to take care of their pets or to retrieve a toy. *Id.* at 1215. The Tenth Circuit concluded the prolonged seizure violated the Fourth Amendment. *Id.* at 1220. The facts here are even more compelling for Alexander: The delay in *Elmore* was significantly shorter than this case and the seizure in *Elmore* occurred during daytime hours. *See United States v. Ravich*, 421 F.2d 1196, 1201 (2d Cir. 1970) (noting the "peculiar abrasiveness" of nighttime searches of someone's home).

Moreover, here Detective Gilhooley went *home* for the night at 10:00 p.m. He has offered no evidence to explain why he did not, and could not, submit his warrant application to the court that night, especially knowing that Alexander and others were dispossessed of their residence awaiting resolution of the warrant request. *Cf. United States v. Rosa*, 626 F.3d 56, 58 (2d Cir. 2010) (investigator in Oswego County, New York, applied for a search warrant after 2:00 a.m.); *United*

41

*States v. Banks*, 60 F.4th 386, 391 (7th Cir. 2023) ("The suppression testimony confirmed that Sangamon County, where Springfield is located, has a judge on call 24 hours a day, 365 days a year to consider and issue search warrants. The officers here had more than enough time to pick up the telephone . . . ."); *United States v. Song Ja Cha*, 597 F.3d 995, 1006 (9th Cir. 2010) ("[T]he officers involved should have known that when there is an urgency to obtain a search warrant, a detached magistrate judge may be located at any hour to approve a warrant application."); *Brennan v. Township of Northville*, 78 F.3d 1152, 1155 (6th Cir. 1996) ("Yankee testified . . . that an emergency magistrate was available in the evenings for the purpose of obtaining search warrants[.]").

In addition, the warrant request was not particularly complicated. The 4 ½ page document includes a lengthy boilerplate recitation of Detective Gilhooley's background and qualifications, a 1 ½ page summary of the events leading to the request, and a brief list of places to be searched and items to be seized. The warrant application on its face doesn't appear to have required over 12 hours of preparation time by a seasoned detective.

We recognize that there may be compelling reasons why Detective Gilhooley could not have applied for a warrant in the late hours of Monday, October 24 or during the early hours of Tuesday, October 25. *See United States v. Escobar*, 805 F.2d 68, 70 (2d Cir. 1986) ("McGivern later . . . told him that it would

take some time to get a search warrant because no magistrate was on duty that night."); *United States v. Gill*, 280 F.3d 923, 929 (9th Cir. 2002) ("The [prosecutor] indicated that the search warrant application would be reviewed over the weekend and a magistrate judge was not available to issue the search warrant[.]"). But Detective Gilhooley bears the burden of justifying a warrantless seizure. *Cf. United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993) (stating that government bears the burden of justifying a warrantless search). And as the party seeking summary judgment, Detective Gilhooley bears the burden of production to show an absence of a genuine issue of material fact. *Amaker*, 274 F.3d at 681.[16]

Here, the delay between leaving Alexander's premises at 8:00 p.m. and applying for a search warrant at 8:30 a.m. remains unexplained. On this record, we cannot conclude as a matter of law that Detective Gilhooley has met his burden of establishing the absence of a genuine dispute as to whether he acted with reasonable diligence, so he is not entitled to summary judgment on the claim that

---

[16] The dissent flips the burdens here and emphasizes that "the record contains no indication that a judicial officer was available to issue a warrant had the application been presented during the night." Dissent at 15. But given that Detective Gilhooley, as the party seeking summary judgment, must establish the absence of a material dispute of fact, and that he will ultimately bear the burden of proving that an exception to the warrant requirement justifies his prolonged seizure and continuing search of Alexander's home, the absence of evidence as to the availability of a judicial officer weighs against granting summary judgment for Detective Gilhooley. *See Amaker*, 274 F.3d at 681 (explaining that if the defendant has not met the burden of production to show an absence of a genuine dispute of material fact, "summary judgment must be denied *even if no opposing evidentiary matter is presented*" (emphasis in original)).

his prolonged seizure of Alexander's home was reasonable under the Fourth Amendment.

### C. Shining a Flashlight into Alexander's Uncovered Cars

We reject Alexander's assertion that Detective Gilhooley violated his Fourth Amendment rights by, without a warrant, shining a flashlight into the windows of two of Alexander's cars, parked in the parking lot by his house. We conclude on this record that the vehicles in question were not within the curtilage of Alexander's home, and Detective Gilhooley's actions did not constitute a search within the meaning of the Fourth Amendment. We thus affirm the district court's summary judgment for Detective Gilhooley on this claim.

As we said earlier, an individual's home occupies a special place under the Fourth Amendment. Curtilage—that is, "the area immediately surrounding and associated with the home"—is also considered "part of the home itself" for the purposes of the Fourth Amendment. *Jardines*, 569 U.S. at 6. However, for surrounding areas that a reasonable person would understand they could use to ingress and egress without trespassing, such areas are not considered curtilage. *See United States v. Hayes*, 551 F.3d 138, 146 (2d Cir. 2008) (noting a "normal route of access for anyone visiting the premises" would not be curtilage).

Thus, in *United States v. Jones*, we held that where a car is parked in a driveway shared by other tenants in a multi-family building, a suspect does not

have a reasonable expectation of privacy over the vehicle, and an officer may look into the vehicle without a warrant. 893 F.3d 66, 72 (2d Cir. 2018); *cf. Collins v. Virginia*, 584 U.S. 586, 593–94 (2018) (because no visitor would view a driveway segment enclosed on three sides by a house and brick wall as part of the path to the front entryway of the house, a motorcycle in that spot was in the curtilage of the suspect's home and an officer's warrantless search violated the Fourth Amendment).

On the record evidence before us, a reasonable jury could not conclude that the areas in which Alexander's cars were parked constituted curtilage. According to Detective Gilhooley's description, which Alexander does not dispute, it appears that visitors must use the driveway as an avenue for ingress and egress to the house's entryway from the road. Alexander has adduced no evidence that the two towed cars were parked in any enclosures or that he took any steps to protect them from observations by people passing by. He also called the area a "parking lot," which undermines any argument that the driveway could be considered part of the home. Dist. Ct. Dkt. No. 119-2 at 98. Without any opposing evidence to consider, there is no genuine dispute that Alexander's cars were parked outside the curtilage of his home. So, as a matter of law, Detective Gilhooley did not

conduct a search for Fourth Amendment purposes when he shined his flashlight into the vehicles.[17]

## II.    False Arrest and Malicious Prosecution Charges

Our above analysis impacts Alexander's claims for false arrest and malicious prosecution in connection with the burglary charges, but not the others. We first consider his false arrest claims, then his malicious prosecution claims.

### A. False Arrest

Alexander's complaint includes false arrest claims against Detective Gilhooley and the City.[18]  We consider each in turn.

#### 1.  Claims Against Detective Gilhooley

The district court concluded that Alexander's false arrest claims (state and federal) fail because Detective Gilhooley had probable cause to arrest Alexander for burglary of his police-seized home.  Because Detective Gilhooley's probable

---

[17] In his appeal brief, Alexander contends that one of the cars was parked on his mother's property, which abuts his.  This assertion does not appear to be grounded in any testimony or other evidence in the summary judgment record.  And Alexander's claim that his car was actually parked on his mother's property does not help his case, as the record doesn't suggest that he had any greater expectation of privacy if his car was parked on his mother's side of the driveway. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978) ("[T]he protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.").

[18] Alexander does not allege County involvement in his initial arrest.

cause to arrest Alexander rises and falls with the lawfulness of his seizure of Alexander's home, we disagree.[19]

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures[,] is substantially the same as a claim for false arrest under New York law." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021). "Probable cause to arrest is a complete defense to a false arrest claim." *Kee*, 12 F.4th at 158. If there is probable cause to arrest a plaintiff "for *any* crime—whether or not that particular crime was closely related to the offense the officers said was the reason for the arrest"—then a plaintiff cannot prevail. *Id.* at 158–59 (emphasis in original).

Detective Gilhooley doesn't deny that he arrested Alexander mid-day on Tuesday, October 25. The critical question here is whether he had probable cause

---

[19] In his brief, Alexander argues that (1) he was falsely arrested for burglary because he did not personally enter the house, and (2) he can't be charged with conspiracy because it takes two to make a conspiracy and nobody else was charged. These arguments obviously fail. But viewing Alexander's brief as raising the strongest arguments that it suggests, *United States v. Pilcher*, 950 F.3d 39, 44 (2d Cir. 2020), we consider whether Detective Gilhooley had probable cause to arrest Alexander for burglary of his own home.

to do so.  When Detective Gilhooley first arrested Alexander, he did so because he believed Alexander committed a substantive burglary offense and three inchoate offenses—conspiracy, facilitation, and solicitation of second-degree burglary—all in connection with Duff's retrieval of Alexander's property from his home. Critically, at the time of the arrest, SPD had not executed the search warrant, and thus had not lawfully obtained any evidence of Alexander's drug possession.  Nor had L.M. implicated Alexander in her sexual assault.   So, when Detective Gilhooley arrested Alexander, he only knew Duff had been caught entering Alexander's home; that's the only potential basis for Detective Gilhooley's initial arrest of Alexander.

In New York, a person commits second-degree burglary when the person "knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when . . . [t]he building is a dwelling."  NYPL § 140.25.  A person enters or remains unlawfully in a building if the person "is not licensed or privileged to do so."  NYPL § 140.00(5).  At issue is whether Detective Gilhooley had probable cause to believe that Duff lacked license or privilege to enter Alexander's home at his direction.  Viewing the facts in the light most favorable to Alexander, a reasonable jury could say no.

If Detective Gilhooley's seizure of the home was unlawful from its inception, then Alexander and Duff never lost license or privilege to enter

Alexander's house. *See People v. Leonard*, 62 N.Y.2d 404, 407 (1984) (holding a state university's unlawful banishment order precluded a trespass conviction because the defendant still retained license and privilege to be on the premises); *Brown v. Hoffman*, 122 A.D.3d 1149, 1150–52 (3d Dep't 2014) (holding a county employee lacked probable cause to arrest an individual for trespass because the county employee lacked authority to remove plaintiff, and, therefore, the plaintiff had license and privilege to remain on the premises); *accord Storey v. Taylor*, 696 F.3d 987, 993–94 (10th Cir. 2012) (no probable cause to arrest suspect for failing to obey an unlawful order). Because a jury could find the seizure of Alexander's house violated the Constitution, *see* Sections I.A and I.B. above, it could also find that Alexander, and Duff on his behalf, retained license and privilege to enter the dwelling.

It's true that probable cause for any crime—not just the burglary-related charges—can defeat Alexander's false arrest claim premised on his arrest for the burglary charges. *Kee*, 12 F.4th at 158–59. But Detective Gilhooley has not pointed us to any other offense for which he could have lawfully arrested Alexander at the time he arrested him for burglary. As the movant for summary judgment, Detective Gilhooley shoulders the burden of production to show an *absence* of a genuine dispute of material fact. *Amaker*, 274 F.3d at 681. By not pointing us to probable cause for any other offenses, he has not carried this burden.

49

We therefore conclude that a jury could find Detective Gilhooley arrested Alexander without probable cause for any crime. Summary judgment should not have been awarded on Alexander's § 1983 and New York claims of false arrest against Detective Gilhooley.

2. Claims Against the City

Alexander does not on appeal challenge the district court's dismissal of all § 1983 claims against the City, but he does challenge the dismissal of his parallel state law claims. Under New York law, municipalities can incur vicarious liability for common law torts their employees commit. *Lepore v. Town of Greenburgh*, 120 A.D.3d 1202, 1204 (2d Dep't 2014). Because a jury could render a verdict against Detective Gilhooley for falsely arresting and maliciously prosecuting Alexander on the burglary charges, a jury could do the same with respect to the City. We therefore vacate the award of summary judgment to the City on the false arrest claim.

*B. Malicious Prosecution*

With respect to Alexander's claims of malicious prosecution under § 1983 and New York law, we affirm the district court's award of summary judgment insofar that the claims are premised on the drug, sexual assault, and unlawful imprisonment charges. As for Alexander's malicious prosecution claims premised on the burglary charges, we vacate and remand the judgment for substantially the

50

same reasons that we reinstated the false arrest claim.  We begin with Alexander's claims against Detective Gilhooley, and then consider his claims against the City.[20]

### 1.  Claims Against Detective Gilhooley

To prevail on a malicious prosecution claim under New York law, a plaintiff must show "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice."  *Kee*, 12 F.4th at 161–62.  Section 1983 requires these same four elements, *see id.*, but it also imposes an additional one: "(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  *Rohman v. New York City Transit Authority*, 215 F.3d 208, 215 (2d Cir. 2000); *see also Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024) (explaining that claims of § 1983 malicious prosecution allege a type of unreasonable seizure, which takes the form of "the wrongful initiation of charges without probable cause").

And, unlike Fourth Amendment claims of false arrest, in the Fourth Amendment malicious prosecution context, probable cause must support *each* charge brought by the prosecution.  *Chiaverini*, 602 U.S. at 562–63.  In other words, "the bringing of one valid charge in a criminal proceeding [does] not categorically

---

[20]  We don't understand Alexander to make a malicious prosecution claim against the County.

preclude a [malicious prosecution] claim based on the Fourth Amendment." *Id.* at 563. Probable cause exists where officers have "knowledge or reasonably trustworthy information" that a crime has been committed. *Triolo v. Nassau County*, 24 F.4th 98, 106 (2d Cir. 2022).[21]

Probable cause plainly supported the drug, sexual assault, and unlawful imprisonment charges against Alexander. The narcotics and drug paraphernalia found in Alexander's bedroom established probable cause for the drug charges. Likewise, L.M.'s reports to law enforcement and her grand jury testimony—which accused Alexander of imprisoning and sexually assaulting her—created probable cause for the sexual assault and unlawful imprisonment charges. So, as a matter of law, Alexander cannot prevail on any malicious prosecution claim premised on these three criminal proceedings. *See Kee*, 12 F.4th at 166. We affirm the summary judgment for Detective Gilhooley on these claims.

As before, the burglary charges are a different matter. In its opinion, the district court concluded that Detective Gilhooley had probable cause for the

---

[21] Although prosecutors, rather than police, litigate criminal cases, a claim for malicious prosecution can lie against an officer who "play[ed] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Bermudez v. City of New York*, 790 F.3d 368, 376 (2d Cir. 2015); *see also White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988) ("Where . . . the constitutional tort is the action of a police officer in initiating a baseless prosecution, his role as a complaining witness renders him liable [for malicious prosecution] under [§] 1983 . . . .").

burglary charges based on Duff's sworn statement. *Alexander II*, 573 F. Supp. 3d at 738. Implicit in its ruling, then, was a conclusion that the seizure of Alexander's home was lawful, and that the lawful seizure divested Alexander and Duff of their license or privilege to enter the home.

As we've already discussed, there's a genuine dispute over the lawfulness of the seizure of Alexander's home. *See* Sections I.A and I.B above. It therefore follows that there's a genuine dispute as to whether probable cause could support Alexander's burglary charges—the third element of a malicious prosecution claim. The district court erred in ruling otherwise.

As for the remaining elements of a malicious prosecution claim, Alexander has mustered sufficient evidence to carry his burden. First, Alexander's arraignment on the burglary charges constituted a criminal proceeding for the purposes of malicious prosecution. *Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) (explaining an arraignment can serve as the "legal process" required to maintain a suit for malicious prosecution). Second, the prosecution's decision not to indict the case due to its shaky underlying legal theory shows the criminal proceeding terminated in Alexander's favor. *See Kee*, 12 F.4th at 162–64 (explaining that a "favorable termination" for a § 1983 malicious prosecution claim is one that's "indicative of innocence," and that a "favorable termination" for a New York malicious prosecution claim is one that's "not inconsistent with" innocence).

Third, because the City Court ordered that Alexander be detained unless he posted bail, Alexander has shown a sufficient post-arraignment restriction on his liberty that implicated his Fourth Amendment rights. *See Rohman*, 215 F.3d at 216 (holding pretrial release on recognizance was a sufficient post-arraignment restriction).

And last, where probable cause is missing, a jury could infer malice. *Dufort v. City of New York*, 874 F.3d 338, 353–54 (2d Cir. 2017). As we've already said, a jury could find Detective Gilhooley lacked probable cause to arrest Alexander on the burglary charges. Because a jury could so find, it could also infer that Detective Gilhooley acted with malice. *Id.*

What's more, the summary judgment record contains affirmative evidence that's probative of malice. For example, Alexander testified that when his cars were being towed, Detective Gilhooley told him, "This is what happens when you piss me off." Dist. Ct. Dkt. No. 119-2 at 95. The officers also did not arrest Alexander until he attempted to leave his house to go to a nearby corner store to get video footage of the preceding events. And at the CID office, Detective Gilhooley said, "I'm going to give you 15, 20 minutes to think about this. We need some information from another case that you could help us on. If you help us, we'll make this all go away. If not, we're going to bury you." *Id.* at 110. This evidence could amply support a finding that Detective Gilhooley acted with a

54

"wrong or improper motive, something other than a desire to see the ends of justice served." *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03 (1978); *see also Dufort*, 874 F.3d at 353–54 (holding that a jury could find malice where a detective treated someone as a suspect simply to induce him to testify against others).

In sum, the district court should have denied summary judgment on Alexander's § 1983 and New York claims of malicious prosecution against Detective Gilhooley.

### 2. Claims Against the City

For the reasons set forth above, we affirm the district court's summary judgment for defendants on Alexander's malicious prosecution claims, insofar as they are premised on the drug, sexual assault, and unlawful imprisonment charges. And we vacate the judgment for the City on the state law malicious prosecution claim insofar as it derives from the state law claim against Detective Gilhooley. *Lepore*, 120 A.D.3d at 1204 (under New York law, municipalities can incur vicarious liability for common law torts committed by their employees).

## III. Continued Detention After Alexander Posted Bail

We easily affirm the district court's summary judgment for Detective Gilhooley in connection with Alexander's over-detention claims. The claims against the municipal defendants are another matter.

*A. Claims Against Detective Gilhooley*

We need not spend long on these claims. "To establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional deprivation." *Kravitz*, 87 F.4th at 129. New York imposes a similar requirement for claims of false imprisonment. *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 85 (2001) (explaining that New York false imprisonment requires a defendant "intended" to confine a plaintiff).

Here, the summary judgment record includes no evidence that Detective Gilhooley was personally involved in Alexander's bail posting and continued detention. We affirm the district court's judgment on the over-detention claims against Detective Gilhooley.

*B. Claims Against the City and County*

Alexander asserts a § 1983 claim of over-detention and a state law claim of false imprisonment based on his delayed pretrial release on two occasions. He has not challenged the district court's judgment for the City on his § 1983 claim, and we conclude that Alexander has not produced sufficient evidence to impose § 1983 liability on the County. But gaps in the record preclude summary judgment for either municipal defendant on the parallel state law claims.

1. <u>The § 1983 Over-Detention Claims Against the County</u>

In contrast to New York law, § 1983 does not impose vicarious liability on a municipality for the actions of its employees. *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023). Because of this limitation, plaintiffs suing a municipality under § 1983 must show that the unconstitutional action "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers," or governmental custom. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690–91 (1978). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

The evidence viewed in the light most favorable to Alexander suggests that he was held in an Onondaga County detention facility for less than a day after he posted bail for the burglary and drug charges, and he was held for four days after he posted bail on charges relating to the assault of L.M. But he offers no evidence, or even allegations, that the extended detention implemented an official policy or even an informal custom of the County. For this reason, the district court properly awarded the County judgment on Alexander's § 1983 claims arising from his alleged over-detention.

## 2. Alexander's State Law False Imprisonment Claim

The New York false imprisonment claim is a different matter. Under New York law, the elements of false imprisonment and false arrest are the same. *See Hughes v. Vento*, 226 A.D.3d 753, 754–55 (2d Dep't 2024). To prevail on a claim for false arrest in New York, "a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Ashley*, 992 F.3d at 136.

In its opinion, the district court merged its analysis of the state false imprisonment claim with Alexander's § 1983 claim. *See Alexander II*, 573 F. Supp. 3d at 736–37 (discussing claim against the City); *Alexander III*, 2022 WL 79642, at *2 (applying *Alexander II*'s analysis to the County). That was error. The elements of the two claims are distinct, and *Monell* is not a bar to Alexander's state law claims. Alexander alleges two periods of false imprisonment—one after each time he posted bail. Our assessment of the summary judgment motion with respect to these claims turns on what *isn't* known with respect to these claims.

*The First Bail Posting*. The record reflects the following: Alexander posted bail on the burglary and drug charges on October 29. The County arrested Alexander on the sexual assault charge at 12:30 p.m. that same day. At all relevant

times, Alexander was detained at the *County* Justice Center. For summary judgment purposes, that's what we know.

Importantly, there is no evidence in the record as to what time Alexander posted bail. Was it *before* his arrest for sexual assault? If so, how long before? If he posted bail well before his arrest for sexual assault, why was he held thereafter? And at whose behest was he detained? Were the driving decisions attributable to the City, the County, or both? We can imagine scenarios in which his detention after posting bail on October 29 was unproblematic. But doing so requires us to make speculative inferences.

*The Second Bail Posting.* Likewise with the second bail posting. On November 3, Alexander posted bail on his sexual assault charges. Yet, if we credit the evidence most favorable to Alexander, he was not released until November 7—a delay of four days, or 96 hours. That would be a problematic gap.

But the record contains conflicting evidence from Alexander himself as to whether he was in fact detained for four days after posting bail. And we have no evidence from the County as to why he was detained.

On this record, gaps in the evidence preclude summary judgment for either municipal defendant with respect to Alexander's over-detention claims. Ultimately, Alexander will bear the burden of proof with respect to these claims at trial, where such evidentiary gaps would work against him. But in this

59

summary judgment posture, the City is the party seeking summary judgment, and the County argues for affirmance of a judgment in its favor that it didn't affirmatively request. It is therefore incumbent upon these defendants to establish the absence of a genuine issue of material fact such that they are entitled to summary judgment. *Amaker*, 274 F.3d at 681 (where a defendant seeking summary judgment fails to meet its burden of production, "summary judgment must be denied *even if no opposing evidentiary matter is presented*" (emphasis in original)).

Neither defendant has pointed to evidence as to when Alexander was released and why his release was delayed, if, in fact, it was. *See* Fed. R. Civ. P. 56(a). In its own summary judgment filing, the City apparently didn't view this as an issue raised by Alexander's pleadings. And the County submitted a perfunctory filing that simply said it did "not intend to oppose the Court's on its own granting of summary judgment," Dist. Ct. Dkt. No. 135. The City and County did not satisfy their respective burdens of production, so we must conclude that the district court erred when it awarded both defendants summary judgment on Alexander's state law false imprisonment claims. *See Amaker*, 274 F.3d at 681.

\*    \*    \*

We have considered the parties' remaining arguments and conclude that they are either without merit or do not warrant discussion. For the foregoing

reasons, we **VACATE** the judgment of the district court with respect to the

following claims:

*Against Detective Gilhooley*

- § 1983 claim based on the warrantless entry and search, and the ensuing prolonged warrantless seizure and further search of Alexander's home
- § 1983 and New York claims of false arrest
- § 1983 and New York claim of malicious prosecution (as it relates to the burglary charges only)

*Against the City*

- New York claim of false arrest
- New York claim of malicious prosecution (as it relates to the burglary charges only)
- New York false imprisonment claims

*Against the County*

- New York false imprisonment claims

We **AFFIRM** the judgment of the district court with respect to Alexander's

other claims, and **REMAND** for further proceedings consistent with this opinion.[22]

---

[22] As a final note, if Alexander requests it, we encourage the district court to consider appointing Alexander counsel on remand. As the district court's opinions and ours have shown, this case is highly fact intensive, implicates complicated legal doctrines, and involves an intricate matrix of claims and defendants.

Jon O. Newman, Senior Circuit Judge, dissenting from those parts of the Court 's opinion that remand for further proceedings.

At the time of the events in question, plaintiff-appellant, Troy Alexander, owned a house in Syracuse, New York, (1) which he used to conduct a prostitution business, (2) from which he sold narcotics, and (3) in which, when Alexander was present on the night of October 23, 2016, a brutal rape was committed on 19-year-old Lashauna Monahan, for whom Alexander acted as a pimp. Defendant-appellee Rory Gilhooley, a detective with the Syracuse Police Department, investigated the crimes that occurred at Alexander's house.

The Court reverses in large part the district court's grant of summary judgment for Gilhooley and in part the grant of summary judgment for the City of Syracuse ("City") and the County of Onondaga ("County"). The Court remands to afford Alexander an opportunity to collect money primarily from Gilhooley for alleged violations of his constitutional rights and, to a limited extent, from the City and the County for alleged violations of Alexander's state law rights.

I respectfully dissent from the remand for two reasons. First, *before* Gilhooley took any actions against Alexander, undisputed evidence gave Gilhooley probable cause to take all of the actions that the Court contends might

1

have violated Alexander's rights. Gilhooley committed no constitutional violations. I would therefore affirm the district court's grant of summary judgment in favor of Gilhooley. Second, Alexander's claims against Gilhooley encounter the defense of qualified immunity, which Gilhooley pled in his answer[1] and asserted in support of his motion for summary judgment.[2] I would also affirm the grant of summary judgment for the City and the County.

Here are the facts that Gilhooley was entitled to believe, as a result of his own investigation and information collected by other police officers,[3] before taking any of the actions against Alexander that are claimed to violate the Fourth Amendment. On the morning of October 24, Monahan ran out of Alexander's house, completely naked and bleeding heavily from her groin area. She had been sexually assaulted in the basement of Alexander's house the night before. Alexander was then sitting in the first floor of the house. The assault included forced anal intercourse and forced oral sex while Monahan was tied to a bench. Her mouth was first glued shut, then pried open to permit the oral sex, and then

---

[1] Gilhooley's Amended Answer, ¶ 99, Dist. Ct. Dkt. No. 8.
[2] Memorandum of Law in Support of Motion for Summary Judgment by Defendants City of Syracuse and Detective Rory Gilhooley, Point VI at 23-24, Dist. Ct. Dkt. No. 119-48.
[3] Gilhooley's knowledge includes the collective knowledge of other members of the Syracuse Police Department. *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003).

2

again glued shut. She was repeatedly burned with lit cigarettes and injected with narcotics.

At a hospital later that day, police officers observed cigarette burns on the side of Monahan's face and her shoulder. They also observed peeled skin and a white substance on her lips. They saw cuts on her left wrist consistent with having been cut with a multi-blade razor.

A police officer learned from an emergency room doctor that X-rays of Monahan showed a razor blade lodged inside her anal cavity. Surgery was required to remove it.[4]

On the evening of October 24, Sergeant Rosillo and Sergeant Metz secured Alexander's house, put up crime scene tape, and posted officers at the house, pending the obtaining of a search warrant, to prevent anyone from entering the house who might tamper with, remove, or destroy evidence of the gruesome crime that had occurred there.

That night Gilhooley knocked on the door of the house, a woman opened the door, and Gilhooley and other police officers entered. The woman later claimed that police officers "pushed" their way into the house.

---

[4] Reporting these details of the brutal assault upon a 19-year-old victim invades no privacy interest of hers because she has recently died of a drug overdose.

Gilhooley stated in his deposition that "we made sure that no one else was in the upstairs of the house or in the basement," and that "everyone in the house that we were securing pending getting a search warrant . . . had to leave."

After Gilhooley left the house, he saw three cars in the driveway area. Alexander acknowledged that he owned these cars. Gilhooley looked through the windows of the cars and saw what he believed was blood on the seats of two of the cars. Gilhooley directed another officer to have these cars towed.

Later that same evening, Detective Travis Holmes was assigned to watch the house to make sure that no unauthorized person entered pending the obtaining of a search warrant. Detective Holmes saw Tereia Duff, Alexander's cousin, speaking with Alexander. Still later, Detective Holmes heard a noise coming from the second floor of the house and entered the house, which was then secured to prevent anyone from entering. He encountered Duff running toward a locked bedroom on the third floor. She had a key in her hand. She told Holmes that Alexander had given her the key to the locked bedroom and had asked her to go inside the house and retrieve his phone.[5]

_____

[5] The entry by Holmes has no bearing on Alexander's Fourth Amendment claims against Gilhooley, who did not enter the house when Holmes did. Holmes' entry is relevant to Gilhooley's arrest of Alexander for burglary offenses stemming from Alexander's direction to Duff to retrieve his phone. Alexander claimed in a deposition that some officers entered the house

That evening Gilhooley returned to the Criminal Investigations Division ("CID") and began preparing an application for three warrants, one to search the house and two to search the towed automobiles. At 10 p.m. when his shift ended, Gilhooley went home to sleep. He returned to CID at 8 a.m. the next morning and finished the search warrant application at 8:30 a.m. Gilhooley's application is a five-page single-spaced document. A state court judge issued the search warrants at 10:20 a.m.

Later on the morning of October 25, Gilhooley arrested Alexander on charges of burglary and conspiracy, facilitation, and solicitation related to the burglary charge. Police officers searched the house at 4 p.m. that day and found narcotics and narcotics paraphernalia. Alexander was arrested and charged with narcotics offenses.

Subsequent police interviews occurred with various witnesses, but they are not relevant to my view that undisputed evidence known to Gilhooley on October 24 suffices to defeat all of Alexander's claims.

I. Alexander's claims against Gilhooley

---

after Holmes did, but he did not name Gilhooley as one of them. Alexander's statement that "they changed shifts, they came, the new officers went" indicates that those entering were the officers assigned to guard the house. Alexander Dep. at 101. Dist. Ct. Dkt. No. 119-2.

Alexander's amended complaint alleged several causes of action. Although that complaint is not entirely clear as to what claims Alexander is making specifically against Gilhooley, the Court considers the following claims: (1) unlawful "seizure" of the house, (2) unlawful initial entry into and search of the house, (3) prolonged "seizure" of the house, (4) delay in applying for a search warrant, (5) unlawful search of upstairs rooms in the house, (6) looking into and towing Alexander's cars, (7) arresting Alexander for burglary charges, (8) malicious prosecution for drug, sexual assault, and unlawful imprisonment charges, and (9) detention after posting bail. I consider each claim separately.

1. Unlawful "seizure" of the house

The Court remands the grant of summary judgment in favor of Gilhooley because he might be shown to have violated the Fourth Amendment by what the Court calls his "Search and Seizure of Alexander's Home." Ct. Op. at 27. I first consider the claim of unlawful "seizure" and then the claim of unlawful search.

Preliminarily, I note that "seizure" is the wrong word to describe the action that Gilhooley took with respect to the house. When a government officer lawfully "seizes" something, narcotics for example, the government takes possession of the narcotics, retains it until the conclusion of a criminal case, and

then destroys it. *See*, *e.g.*, *Dusenbery v. United States*, 534 U.S. 161, 163 (2002) (describing Government's process of seizing drugs and drug paraphernalia during a search, retaining them, and disposing of them after criminal case is concluded); *Soviero v. United States*, 967 F.2d 791, 792 (2d Cir. 1992), (drug paraphernalia seized during search retained by Government and destroyed); *Lovelace v. United States*, No. 00 Civ. 1274, 2001 WL 984686, at *4 (S.D.N.Y Aug. 27, 2001) (Government may hold seized property for evidentiary use throughout duration of case). Or when a government officer lawfully "seizes" property in which contraband has been stored, the seized property belongs to the government. *Luis v. United States*, 578 U.S. 5, 13 (2016).

In this case, no one is claiming that Gilhooley took possession of the house or that his action rendered the house the property of the City of Syracuse.

What Gilhooley did was "secure" the house for the entirely valid purpose of preventing anyone who might alter, destroy, or remove evidence of a crime from entering the house. "Securing" implies the temporary nature of the interruption of the owner's possessory interest in his property.[6] *See Segura v. United*

---

[6] I acknowledge that the Supreme Court has called preventing entry into a trailer, serving as a home, a "seizure," *see Illinois v. McArthur*, 531 U.S. 326, 329, 330, 331, 333, 334 (2001), and one justice has called such action an "impoundment," *id.* at 337 (Souter, J., concurring). I will call what Gilhooley did with respect to Alexander's house "securing" it, although I do not think that the

7

*States*, 468 U.S. 796, 808 (1984); *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020).

The Supreme Court has upheld the temporary securing of a home while a search warrant was being obtained. *Illinois v. McArthur*, 531 U.S. 326 (2001). In *McArthur*, police officers prevented the owner of a trailer, used as a home, from entering for about two hours. *Id*. at 328. The officers had been told that narcotics were in the trailer. *Id*. at 329.

The Court concluded that the facts established sufficient "'exigent circumstances'" to justify the temporary warrantless *securing* of the home. *Id*. at 331 (emphasis added). The Court cited *United States v. Place*, 462 U.S. 696, 701 (1983) with this parenthetical: "('(T)he exigencies of the circumstances' may permit temporary seizure without warrant.)". In ruling that the duration of the interval that the trailer was secured was reasonable, the Court noted that it had previously upheld the warrantless detention of personal possessions for intervals as brief as

---

choice of a word has any bearing on the lawfulness of his action. Other courts have called such action "secure" or "secur[ing]" the premises. *See, e.g.*, *United States v. Alexander*, 573 F.3d 465, 477, 478 (7th Cir. 2009); *United States v, Picariello*, 568 F.2d 222, 225, 226 (1st Cir 1978); *United States v. Guidry*, 534 F.2d 1220, 1223 (6th Cir. 1976). Gilhooley described his action as "securing the house pending getting a search warrant." and stated, "We informed the occupants, including Mr. Alexander, that the house was being secured."

90 minutes, *Place*, 462 U.S. at 709-10, and as long as 29 hours, *United States v. Van Leeuwen*, 397 U.S. 249, 253.(1970). *McArthur*, 531 U.S. at 332-33.

Even stronger support for securing the house until a warrant could be obtained is provided by the Supreme Court's decision in *Segura*. In that case, the Court made a critical distinction between the initial warrantless entry, which the Court assumed without deciding was unlawful, and the subsequent securing of the house. "We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Segura*, 468 U.S. at 810. "In other words, the initial entry—legal or not—does not affect the reasonableness of the seizure." *Id.* at 811.

Whether or not there were exigent circumstances permitting the warrantless entry, there was abundant probable cause for securing the premises, based on what Gilhooley knew about the crimes that had been committed there. Undisputed evidence established that prior to securing the house, Gilhooley was informed that it was being used for selling narcotics and facilitating prostitution, and had been the scene of a brutal sexual assault when Alexander was present in the house. That knowledge fully justified securing the house, until a search

warrant could be obtained, in order to prevent anyone from entering the house and altering, destroying, or removing evidence of serious crimes. Securing the house did not violate the Fourth Amendment.

The Court's opinion misunderstands a crucial point of my dissent when it says that "there is no separate 'securing-the-premises' category of law enforcement activity that is exempt from Fourth Amendment scrutiny." Ct. Op. at. 36. I make no claim that securing a home is exempt from Fourth Amendment limitations. Rather, my point is that securing a home without a warrant to temporarily exclude entry by those who might alter, remove, or destroy evidence is a significantly different form of interference with a homeowner's possessory interest in his home than an entry and search of a home without a warrant. Of course, the Fourth Amendment applies to securing a home. But, as *Segura* fully explains, Fourth Amendment reasonableness is more easily met when the police bar people from entering a crime scene than when they enter and conduct a thorough search.

Alexander's request for damages because the house was secured is entirely without merit. To whatever extent he is seeking what would at most be nominal damage damages for the entry itself, that claim is defeated by the defense of

qualified immunity, see *infra* pp. 12-13, since the Supreme Court in *Segura* explicitly declined to rule on the lawfulness of the entry made to lawfully secure a house.[7]

(2) Search of the house after initial entry

The Court remands to permit consideration of Alexander's claim that Gilhooley's search of the house after his initial entry might have violated the Fourth Amendment. Ct. Op. at 27-33. The Court begins with the undeniable proposition that a warrantless search of a home is presumptively unreasonable under the Fourth Amendment.[8] *United States v. Simmons*, 661 F.3d 151, 156–57 (2d Cir. 2011). The Court then acknowledges that there are exceptions to the warrant requirement for entering and searching a home and asserts that in this case only two exceptions "come into play—consent and exigent circumstances." Ct. Op. at 28. The Court concludes that Gilhooley did not get consent to enter the home, *id.*, and that the exigent circumstance exception is not available, Ct. Op. at 28-35.

In reaching its conclusion concerning exigent circumstances, the Court focuses on a branch of the exigent circumstances exception that is not involved in

---

[7] *Segura*, 468 U.S. at 802 n.4.

[8] Whether a home being used to conduct a prostitution business and a narcotics business is entitled to the same degree of Fourth Amendment protection as a home serving only as a residence is questionable, but that issue need not be resolved in this case.

this case. That branch concerns exigent circumstances that justify a warrantless entry into, and search of, a home to *seize* evidence likely to be destroyed, for example, narcotics likely to be flushed down a toilet. *See*, *e.g.*, *United States v. Andino*, 768 Fed 94, 101 (2d Cir. 2014); *United States v. MacDonald*, 916 F.2d 766, 770 (2d Cir. 1990).

What the Court ignores is a different branch of the exigent circumstances exception that is involved in this case. That branch concerns a warrantless entry into a house that has lawfully been secured, not to search for or seize anything, but to make sure that no one is in the house who might alter, destroy, or remove evidence of serious crimes before a search warrant is obtained and to remove anyone found there. With Gilhooley entitled to prevent anyone from entering the secured house, he was equally entitled to go into the house and make a limited search to see if anyone was in the house and remove anyone already there. *United States v. Miller*, 430 F.3d 93, 98 (2d Cir. 2005) (law enforcement officers entitled to sweep premises to determine whether individuals who might pose a threat remain inside); *United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983) (law enforcement officers "entitled to make a limited security search of the premises" and to "remain on the premises to secure the apartment from the destruction of evidence"). It

would make no sense to say that police can prevent those outside a secured house from entering to prevent tampering with, destroying, or removing evidence, but they are powerless to require those inside the house to leave.

As to the exception for consent, Gilhooley did not need consent to enter the secured house to remove occupants.

The initial entry into a lawfully secured house and the limited search for occupants did not violate the Fourth Amendment. Furthermore, no case has ruled such a limited search unconstitutional (which is understandable); Gilhooley is therefore entitled to qualified immunity on this claim. *See Mullinex v. Luna*, 577 U.S. 7, 11-12 (2015).

In a footnote the Court points out that Gilhooley did not assert a qualified immunity defense on appeal "and therefore *could be construed* to have forfeited this argument."[9] However, the Court does not rule that the defense has been forfeited. If not ruled forfeited, the defense, which was asserted in the District Court,[10] is available. And we may affirm on any ground that finds support in the record.

Furthermore, the only case the Court cites in the footnote that involves a qualified immunity defense makes clear that even when a qualified immunity

___

[9] Ct. Op. at 23 n.9 (emphasis added).
[10] *See supra* p. 2 nn. 1, 2.

defense has not been asserted at all, "we nevertheless have the power to consider it." *Fabrikant v. French*, 691 F.3d 193, 212 (2d Cir. 2012) (citation omitted). In *Fabrikant*, the defendants had not asserted a qualified immunity defense in any district court pleading nor raised the defense on appeal. Nonetheless, this Court considered the defense on the Court's own initiative when it directed the parties on remand to brief the issue of qualified immunity. *Id*. at 204. In *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011), also cited by the Court, we said, "To be sure, the doctrine of forfeiture is prudential and may be disregarded in our discretion." If ever there was a case for exercising our discretion not to invoke forfeiture of a qualified immunity defense, this is it.

(3) Prolonged "seizure" of the house and (4) delay in applying for a search warrant

The Court reverses summary judgment for Gilhooley on two overlapping grounds concerning delay. One is the "prolonged seizure" of the house, Ct. Op. at 39. The other is the delay in applying for a search warrant. The Court states, "[T]he delay between leaving Alexander's premises at 8:00 p.m. and applying for a search warrant at 8:30 a.m. remains unexplained." *Id*. at 46.

14

This assertion is not so. Gilhooley testified at his deposition that from 8 p.m. to 10 p.m. he was at the CID preparing an application for three search warrants. He also testified that he went home at 10 p.m. because his shift had ended. He further testified that he returned to the CID at 8 a.m. the next morning and from 8 a.m. to 8.30 a.m. completed his single-spaced five page application. The time period from 8 p.m. to 8:30 a.m. the following morning has been fully explained.

Not presenting this warrant application to a judge until 8:30 a.m. on October 25 did not violate the Fourth Amendment. Gilhooley had spent many hours on October 24 investigating a brutal crime. He interviewed several witnesses. He understandably took the time to prepare a detailed application. Judges throughout the judiciary who often take several weeks and even months to prepare opinions are not well positioned to assess the time needed to prepare a search warrant application in a complicated case. Gilhooley was entitled to sleep at his home after a long workday when his shift ended at 10 p.m. before he returned to the CID at 8:00 a.m. And the record contains no indication that a judicial officer was available to issue a warrant had the application been presented during the night.

It is not clear when securing the house ended, but that interval appears to overlap with much of the time that Gilhooley took to apply for the three search

warrants. Once police officers were inside the house searching it later on the morning of October 25, pursuant to a search warrant, nothing in the record indicates that residents of the house could not then enter.

Even if securing the house lasted for the entire 12.5 hours until Gilhooley applied for the search warrant, the Supreme Court's decision in *Segura* refutes the claim that the delay was unreasonable. First, the delay in *Segura*, which the Court rule was not unreasonable, was 19 hours.[11] Especially pertinent to the pending case, the Court wrote, "[M]ore than half of the 19-hour delay was between 10 p.m. and 10 a.m. the following day, when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests."[12]

The Court's cite to *United States v. Smith*, 967 F. 3d 198 (2d Cir. 2020), to support Alexander's claim is especially perplexing. The delay in obtaining a search warrant in *Smith* was one month; in the pending case the delay in applying for a warrant was at most 12.5 hours. The relevance of *Smith* escapes me.

Neither the duration of the time that the house was secured nor the time that Gilhooley took to prepare his warrant application violated the Fourth Amendment.

---

[11] *Segura*, 368 U.S. at 801.
[12] *Id*. at 812-13.

16

Furthermore, no case has established a rule that an officer acts unreasonably when, having secured the scene of a brutal crime at 6:50 in the evening, he does not apply for a search warrant until 8:30 the following morning.[13] Gilhooley was protected by the defense of qualified immunity.[14] *See Mullinex*, 577 U.S. at 11-12.

(4) Unlawful search of upstairs rooms in the house

The Court apparently remands to consider a claim that, after the initial entry, Gilhooley searched the upstairs rooms of the house. Although this claim is not precisely asserted as a reason for the remand, subsection IA of the Court's opinion is captioned *"The Initial Warrantless Entry into and Search of Alexander's Home."* Ct. Op. at 27. To support this search claim, the Court asserts that "the record includes evidence that upon entering the house, the officers under Detective Gilhooley's direction conducted a room-by-room search, opening drawers and throwing residents' belongings around, even *after* the residents were

---

[13] *United States v. Elmore*, 101 F.4th 1210 (10th Cir. 2024), on which the Court relies, Ct. Op. at 43, involved an eight-hour *daytime* interval between securing a home and applying for a search warrant, 101 F.4th at 1214-15, an interval when judicial officers authorized to issue search warrants are available.

[14] It would have been preferable for Gilhooley to have permitted the residents of the house to reenter as soon as the house had been cleared and to assign another officer to remain in the house overnight to guard against others entering and to assure that any residents admitted into the house did not tamper with evidence, but what is preferable is not the measure of constitutionality.

removed from their rooms." *Id.* at 41 (emphasis in original). For this claim the Court cites page 22 of the District Court's docket No. 119-7. *Id.* That docket number identifies the deposition of James Jones ("Jones Dep."). Jones is Alexander's father. Jones Dep. at 7. He began living on the second floor of Alexander's house in 1951, *id.*, after serving 18 years of a sentence for armed robbery, *id.* at 13.

In his deposition, Jones recounts that he was in his room on the evening of October 24 when police officers entered and emptied the bureau drawers in his room. *Id.* at 22.

Contrary to the Court's assertion, however, Jones does not say on page 22 of his deposition nor on any other page that the officers "conducted a room-by-room search." In fact, he said, "I don't know what they were doing in there." *Id.* at 8.

Most significantly, despite his motivation to support his son's claims, in his 70-page deposition, Jones never names Gilhooley as one of the officers who searched his room. There is thus no evidence that Gilhooley searched Jones' room, much less all of the upstairs rooms.

The Court asserts that officers conducted the upstairs search "under Detective Gilhooley's direction." Ct. Op. at 41. Perhaps the Court is implicitly

attributing to Gilhooley the unnamed officers' search of Jones' room because

Gilhooley said in his deposition that he "was assigned lead preliminary

investigative responsibilities" for the investigation at the house.[15] However,

supervisory liability of a police officer for a constitutional tort by officers under his

command applies only if the supervisor either directs their unconstitutional action

or fails to prevent it when he is in a position to do so.[16] There is no evidence of

such circumstances in the record.

(5) Looking into and towing Alexander's cars

The Court affirms the District Court's grant of summary judgment for

Gilhooley with respect to Alexander's claim that Gilhooley violated his rights by

---

[15] Gilhooley Dep. at 2, Dist. Ct. Dkt. No. 119-8.

[16] *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) ("[A] supervisor may be held liable if he or she was personally a 'direct participant' in the constitutional violation. In this Circuit, a 'direct participant' includes a person who authorizes, orders, or helps others to do the unlawful acts.") (citation omitted).

The First Circuit has offered an interesting analysis of supervisory liability. "Supervisory liability is sui generis. [A] supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority. *See Ramírez–Lluveras v. Rivera–Merced*, 759 F.3d 10, 19 (1st Cir. 2014). This does not mean, however, that for section 1983 liability to attach, a supervisor must directly engage in a subordinate's unconstitutional behavior. *See Camilo–Robles v. Hoyos*,151 F.3d 1, 6–7 (1st Cir. 1998). Even so, the supervisor's liability must be premised on his own acts or omissions. *See Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 562 (1st Cir. 1989); *Figueroa v. Aponte–Roque*, 864 F.2d 947, 953 (1st Cir.1989). Mere negligence will not suffice: the supervisor's conduct must evince 'reckless or callous indifference to the constitutional rights of others.' *Febus–Rodríguez v. Betancourt–Lebrón*, 14 F.3d 87, 92 (1st Cir. 1994)." *Guadalupe-Baez v. PesqueraI*, 819 F.3d 509, 515 (1st Cir. 2016)."

19

shining a flashlight into Alexander's cars that were parked in the driveway and, upon seeing blood on the seats of two of the cars, having these cars towed for further inspection. I agree that Gilhooley's actions did not violate any of Alexander's rights.

(6) Arresting Alexander for burglary

The Court remands for further consideration Alexander's federal and state law claims based on Gilhooley's arrest of Alexander for burglary and related inchoate crimes. Ct. Op. at 49-52.

The evidence is undisputed that, during the interval when Gilhooley had secured the house, Alexander instructed Tereia Duff to enter the house and retrieve his cell phone. That entry constituted burglary under New York law.

The Court's sole reason for remanding Alexander's claims again Gilhooley for the burglary arrest and related offenses is that a jury could find that Gilhooley's securing the house was unlawful. *Id.* at 49 ("Detective Gilhooley's probable cause to arrest Alexander rises and falls with the lawfulness of his seizure of Alexander's home."). Because, as I have explained, *see supra* pp. 7-8, securing the house was not unlawful, there is no reason to reverse the District Court's grant of summary judgment to Gilhooley for the burglary arrest. That arrest was fully supported by undisputed evidence constituting probable cause.

(7) Malicious prosecution claims

The Court's disposition of the malicious prosecution claims against Gilhooley is not entirely clear. With respect to malicious prosecution for the burglary charge, the Court rejects the summary judgment for Gilhooley because of its view that securing (the Court calls it "seizing") the house could be found to be unlawful. Ct. Op. at 52. As I have explained, *see supra* pp. 7-8, I disagree with that aspect of the Court's ruling. With respect to the other charges, at first the Court concludes that "Probable cause plainly supported the drug, sexual assault, and unlawful imprisonment charges against Alexander," Ct. Op. at 55, and therefore "affirm[s] the summary judgment for Gilhooley on these claims," *id*. at 52. If that is the Court's ruling with respect to these other charges, I agree.

However, the Court ultimately states that "the district court should have denied summary judgment on Alexander's § 1983 and New York claims of malicious prosecution against Detective Gilhooley." *Id*. at 58. This statement is just a repetition of the Court's view that summary judgment for Gilhooley was not justified on the malicious prosecution charge for burglary. If that is the Court's ruling, I disagree, as already explained.

(8) Claim with respect to detention after posting bail

21

The Court affirms the District Court's grant of summary judgment to Gilhooley with respect to Alexander's claim of detention after posting bail because Gilhooley had no involvement in that detention. Ct. Op. at 55. I agree.

## II. Claims against the City

The Court affirms summary judgment for the City on Alexander's malicious prosecution claims, insofar as they are premised on the drug, sexual assault, and unlawful imprisonment charges. Ct. Op. at 58-59. I agree. However, the Court "vacate[s] the judgment for the City on the state law malicious prosecution claim insofar as it derives from the state law claim against Detective Gilhooley." *Id.* at 58. Presumably this means that the Court remands Alexander's malicious prosecution claim against the City on the basis of state law vicarious liability, *see Lepore v. Town of Greenburgh*, 120 A.D.3d 1202, 1204 (2d Dep't 2014), only because the Court bases the malicious prosecution claim against Gilhooley on the premise that securing the house might be shown to have been unlawful. For reasons explained above, *see supra* pp. 7-8, I disagree with the Court's premise. Securing the house was entirely lawful.

The Court remands one aspect of Alexander's false imprisonment claims: the state law claims against the City and County for false imprisonment based

on an alleged failure to release Alexander promptly after he posted bonds on the burglary and the subsequent sexual assault charges. Ct. Op. at 61-63. The Court faults the District Court for merging Alexander's section 1983 claims for false imprisonment with his state law claims. Ct. Op. at 61. This was error, the Court contends, because "*Monell* is not a bar to Alexander's state law claims." *Id.*

However, the District Court did not rely on *Monell* when it granted summary judgment to the City and the County on Alexander's false imprisonment claims. Instead, the District Court made a careful analysis of the claims and fully explained why summary judgment was warranted.[17] The District Court's explanation applies equally to the section 1983 and state law claims for false imprisonment. I see no error in the District Court's analysis.

\* \* \* \* \*

The Court affirms a few portions of the District Court's judgment, but remands most of the judgment for further consideration. I would affirm the entire judgment.

Alexander's house was a den of prostitution, a base for selling narcotics, and the scene of a brutal rape committed against a teenager, for whom Alexander

---

[17] *Alexander v. City of Syracuse*, 573 F. Supp. 3d 711, 735-37 (N.D.N.Y. 2021).

was the pimp, when he was in the living room while the rape was being committed in the basement. The prospect that Alexander will have an opportunity to require a conscientious police detective to pay *him* money damages is a bizarre result that even Kafka could not have imagined.